KEENE CORPORATION, Plaintiff,

v.

INTERNATIONAL FIDELITY INSURANCE COMPANY, Defendant and Third Party Plaintiff,

v.

CHICAGO AUTOMATIC MACHINE, INC., Third Party Defendant.

No. 82 C 2529.

United States District Court, N.D. Illinois, E.D.

Dec. 3, 1982.

On Motion for Reconsideration March 10, 1983.

Richard L. Horwitz, Drendel, Schanlaber, Horwitz & Oakes, Aurora, Ill., for plaintiff.

Gregory A. Friedman, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Intern. Fidelity Ins. Co.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Keene Corporation ("Keene") has sued International Fidelity Insurance Company ("Fidelity") to enforce two surety agreements, each of which guaranteed contract performance by Chicago Automatic Machine, Inc. ("Chicago Automatic"). Fidelity has in turn filed a third party complaint against Chicago Automatic for indemnification.[1] Keene now moves under Fed.R. Civ.P. ("Rule") 54(b) and 56 for partial summary judgment against Fidelity. For the reasons stated in this memorandum opinion and order, Keene's Rule 56 motion is granted (any ruling under Rule 54(b) is deferred).

### Facts[2]

In an October 7, 1978 written proposal, Chicago Automatic offered to manufacture and deliver, within "22–26 weeks" after acceptance, a 20-spindle rotary assembly machine tooled to assemble Keene's roller bearings ("roller bearing machine"). Including an "induction heating system Lepel [a manufacturer of such systems] or equivalent," the proposal quoted a price of $149,-000. Kirk Aff.Ex. 1 at 4–5.[3]

---

1. Chicago Automatic filed Chapter 11 proceedings early in January 1981, triggering an automatic stay of proceedings involving it. That stay does not affect the Keene-Fidelity litigation.

2. Inconsistencies in the parties' factual submissions will be indicated at appropriate places in this opinion. See also Appendix.

3. In connection with this motion the parties have submitted four "affidavits" (but see Appendix) by:

(1) Keene's Kaydon Bearing Division Vice-President and General Manager Patrick Kirk;

(2) Chicago Automatic's consultant George Tarzian (associated with the company since its incorporation in July 1976 and with its predecessor since 1945);

(3) Fidelity's Secretary Francis Mitterhoff; and

(4) Keene's Kaydon Bearing Division Vice-President and General Manager of Industrial Bearings Kenneth Harestad.

Keene accepted the proposal by issuing its October 19, 1978 purchase order (Kirk Aff.Ex. 2) calling for delivery to its plant by the week of March 26, 1979. At Chicago Automatic's behest,[4] Keene purchased a performance bond from Fidelity (Kirk Aff.Ex. 4), paying 2% of the sale price as a premium. Under the performance bond, Fidelity unconditionally guaranteed Chicago Automatic's performance under the contract, with a maximum liability of $149,000.

Shortly thereafter Keene informed Chicago Automatic of its need for a machine tooled to assemble its unitized thrust bearings (the "thrust machine"). Chicago Automatic submitted a January 13, 1979 written proposal (Kirk Aff.Ex. 6). After negotiations (including Chicago Automatic's agreement it would complete the machine by the week of August 6, 1979, Kirk Aff. ¶ 13), Keene accepted the proposal, but at the reduced price of $135,000, by issuing its February 5, 1979 purchase order (Kirk Aff.Ex. 7).

Again Fidelity issued a performance bond in the amount of the contract price contemporaneously with the contract, unconditionally guaranteeing Chicago Automatic's performance (Kirk Aff.Ex. 9). This time however Keene's recovery in case of Chicago Automatic's default was limited to recapture of the monies advanced by Keene.

In the meantime Chicago Automatic asked Keene if it knew of any manufacturers besides Lepel that produced induction heating systems (Harestad Aff. ¶ 6). As a result of that inquiry Chicago Automatic learned of Pillar Corporation ("Pillar"), to whom Chicago Automatic then subcontracted that portion of the contract work.[5]

Pillar completed the heating apparatus sometime in late 1978 or early 1979. But Pillar's system turned out to be inadequate for the needs of the roller bearing machine. For that and other reasons Chicago Automatic did not meet the delivery schedule under the roller bearing machine contract.

In June 1979 Chicago Automatic also requested a ten-week extension to October 30, 1979 for completing the thrust machine contract (Kirk Aff. ¶ 19). Then over the next several months Chicago Automatic sought additional time extensions on both contracts. Keene acceded to the various requests (Kirk Aff. ¶ 20).

On August 1, 1979 and again on September 18, 1979, Keene notified Fidelity of the extended October 30 completion date for the thrust machine in written responses to Fidelity's status requests (made and responded to on Fidelity's regular report forms). Harestad Aff.Ex.A. Apparently Fidelity was not apprised of any schedule changes for the roller bearing machine until sometime in March 1980.[6]

---

4. Throughout the period of the transactions, Fidelity or its principal stockholder owned all of Chicago Automatic's assets.

5. Much of the parties' divergence in their briefing stems from different characterizations of the Pillar involvement and how it affects Fidelity's obligations. For the reasons stated in the Appendix, Fidelity has not created a material issue of fact on that score.

6. This poses an interesting variation as to the facts to be considered on summary judgment motions. Harestad's Affidavit (at 4 n. *) says:
   Keene notified defendant Fidelity of these extensions [as to both machines] on numerous occasions including in August and September 1979, by written response to Fidelity's status requests (Exhibit A).
   However, no supporting *documents* are furnished other than the two status reports referred to in the text. As against that version, Mitterhoff Aff. ¶¶ 3–4 states:

3. I have thoroughly reviewed International's records pertaining to the bonds issued in this matter....
4. Further, my examination has revealed that subsequent to the date the bonds at issue were written, [Fidelity] was not advised until some time in April 1980 of any modifications and/or extensions of time in the agreements between plaintiff and [Chicago Automatic]....
Mitterhoff's "thorough review" is obviously suspect, for the Paragraph 4 statement is directly belied by the two 1979 status reports accompanying Harestad's affidavit. To that extent it is not an impermissible weighing of evidence for this Court to credit Fidelity's *own* documents (at least as to the two reports). Moreover Fidelity's own lawyer Richard Caifano ("Caifano") wrote Keene official Kirk in *March* 1980 referring to Caifano's "investigation to date [having] indicated that your company has agreed to a revised completion sched-

Exasperated by the continuing production delays, Keene wrote Chicago Automatic February 8, 1980 that it would "probably have no choice but to call the performance bonds" if the thrust machine were not completed by April 7 and the roller bearing machine by May 5 (Kirk Aff.Ex. 11). About ten days later, Tarzian of Chicago Automatic responded both machines would be completed in seven weeks (Kirk Aff. ¶ 22 and Ex. 12). Convinced that even this new timetable could not be met, Keene's representatives met with Chicago Automatic's principals and reached agreement (confirmed by Keene's March 5 letter) under which Chicago Automatic would focus its efforts first on the thrust machine, with the week of May 2 as the revised completion date (Kirk Aff.Ex. 13). Attempting to extract an additional two week extension, Chicago Automatic wrote Keene March 17 with a proposed "final timetable on the completion of the thrust machine," designating May 16 as the completion date (Kirk Aff.Ex. 15).

Meanwhile Keene wrote Fidelity on March 6, advising it of Chicago Automatic's failure to make timely completion and delivery of the two machines and inquiring as to the "necessary procedure should we be forced to resort to the Bonding to recover our investment" (Kirk Aff.Ex. 14). By a March 26 letter to Keene, Fidelity attorney Caifano referred to an "agreed . . . revised completion schedule for the machines presently being assembled by Chicago Automatic," calling for "substantially full completion on May 16, 1980." Caifano asked for confirmation of Keene's acquiescence in that schedule revision (Kirk Aff.Ex. 16). But only a month later Caifano reversed course, claiming Fidelity "has become aware [in April 1980] of a novation agreement calling for the extension of compli-

ule for the machines presently being assembled by Chicago Automatic." Surely that too vitiates Mitterhoff's Paragraph 4 conclusion referring to *April* 1980. Nonetheless, because the inference most favorable to Fidelity is that Mitterhoff's record search was imperfect (rather than that his entire affidavit was false), this Court will credit Mitterhoff's statement to the extent not directly contradicted by the status

ance with specifications of the original purchase orders" (Kirk Aff.Ex. 17). For that reason Caifano's letter asserted Fidelity's obligation as surety had been terminated because of the time extension agreement.

Once again Chicago Automatic failed to perform by the promised dates. In the face of that latest default, Keene demanded payment under the two performance bonds (Kirk Aff.Ex. 18 and 19). Fidelity ignored the demand and Keene brought this action.

Complaint Count 1 seeks the full $149,000 amount of the roller bearing machine performance bond, because Keene's claimed damages of $287,400 far exceed that amount. In principal part the asserted damages consist of (1) $71,500 in advance payments ($33,750 of which was advanced almost six months after expiration of the initial performance date) and (2) $187,920 in lost profits that would have been realized from the sale of roller bearings to Chrysler during the period July 1979 through December 1980.[7]

Complaint Count 2 asks reimbursement under the thrust machine performance bond for the $67,500 advanced to Chicago Automatic (the last half of which was paid October 12, 1979, approximately two months after Chicago Automatic failed to meet its first production deadline). Count 3 (not in issue on the current motion) asks punitive damages because of Fidelity's allegedly bad faith refusal to discharge its suretyship obligations.

### Partial Summary Judgment

Keene has moved for summary judgment on Counts 1 and 2. Though conceding Chicago Automatic has defaulted on both contracts, Fidelity advances two affirmative defenses to resist Keene's motion:

reports and the Caifano letter. Fortunately nothing material turns on which version is accepted (as the later text discussion will show).

7. Neither the concept nor Keene's calculation of lost profits has been controverted by Fidelity. If Keene prevails on the legal question of Fidelity's discharge or non-discharge as surety, it is therefore entitled to judgment in full.

1. Chicago Automatic's failure to perform both contracts stemmed from Pillar's contractual defaults, which in turn must be ascribed to Keene because Pillar served as its agent in constructing the heating induction system.

2. Keene's failure to obtain Fidelity's consent to the time extensions relieved Fidelity of its suretyship obligations to the extent of its resulting injury.

Fidelity's first argument does not raise any genuine issue of material fact. Its second is both factually and legally defective.

■ For the reasons stated in the Appendix, the Pillar contention falls of its own weight. Material *facts* to be considered on this motion establish only that Pillar was Chicago Automatic's subcontractor for the induction heating system—a fact irrelevant to Fidelity's liability.[8]

■ Fidelity's second argument is equally barren. It does however call for separate comment on the two performance bonds.

As for the bond on the thrust machine contract, Fidelity was specifically notified of the first ten-week extension a few days before the August 6, 1979 deadline expired. Because Fidelity failed to object, there is clearly no predicate for its making any current complaint about the revised timetable under any theory.

Keene advanced the first $33,750 to Chicago Automatic as a down payment (Kirk Aff.Ex. 8) and the second $33,750 installment October 12, 1979 (Kirk Aff.Ex. 10)—before the additional ten-week period had elapsed. Accordingly Fidelity cannot claim discharge of its liability in any case, and it is obligated to pay the full $67,500.

■ As for the performance bond on the roller bearing machine contract, Fidelity's affirmative defense fails for an equally fundamental reason.[9] Under Illinois law,[10] if the obligee of a surety bond gives the principal additional time to perform, the surety who has not consented to the extension is discharged unless the extension agreement was not founded on independent consideration. 34 I.L.P. *Sureties* § 25, at 255 (1958). Fidelity points to no new consideration whatever for Keene's willingness to defer the completion date. With no dispute as to the damages caused by Chicago Automatic's default, Keene is entitled to the entire $149,000 as a matter of law.

*Conclusion*

There is no genuine issue of material fact and Keene is entitled to a judgment on each of Counts 1 and 2 as a matter of law. Keene is directed promptly to submit a proposed form of judgment order, together with a statement of the basis for imposing and calculating interest and (because Keene seeks inclusion of a Rule 54(b) determination) a statement of the basis for the order's finality, conforming to the teaching of our Court of Appeals. *See, e.g., U.S. General, Inc. v. City of Joliet,* 598 F.2d 1050, 1051 n. 1 (7th Cir.1979).

*Appendix*

This action was originally filed in the Southern District of New York, then transferred here after Keene's summary judgment motion was fully briefed. Unfortu-

8. Even were that not the case—even had Fidelity's affidavits complied with Rule 56 (as they have not) to create a fact issue as to Pillar's having been designated by Keene to do the work—Fidelity has offered no authority for the notion that Keene thereby became legally responsible for Pillar's claimed nonperformance. Indeed it is well settled that the contractor—not the owner, or in this case the purchaser—is responsible for damages inflicted by its subcontractors. *See* 73 Am.Jur.2d *Building and Construction Contracts* § 54, at 58 (2d ed. 1964). Moreover the Pillar issue could not in any case exonerate Chicago Automatic's defaults on the thrust machine contract.

9. As the text discussion indicates, the same analysis would also exonerate any alleged failure by Keene to notify Fidelity of time extensions on the thrust machine contract.

10. Both parties have treated Illinois law as providing the rule of decision in this diversity case. This opinion will not review the operative Illinois choice of law rules in any detail under the circumstances, except to note that each performance bond was executed here, and Chicago Automatic's performance (or more accurately nonperformance) took place here as well.

[redacted] nately the parties followed the New York affidavit practice (at least this Court has not encountered it elsewhere either as a private practitioner or on the bench). That practice appears to consist of generating an olio of evidentiary facts, conclusory statements, statements of intentions or hopes (and sometimes even legal arguments and pejorative comments on the opponent's position), tacking on a jurat and labeling the end product an "affidavit."

Sometimes the practice is harmless enough.[1] But in the summary judgment context it is clearly impermissible. Rule 56(e) of course properly limits affidavits to "such facts as would be admissible in evidence, [to which] the affiant is competent to testify...," for a summary judgment is after all an alternative to and substitute for the trial.

For current purposes the most significant example of the effect of such non-testimonial "affidavits" is in Fidelity's treatment of the situation involving Pillar. Tarzian's affidavit says in summary form, in a way no witness could testify from the stand (Tarzian Aff. ¶¶ 6, 11, emphasis added):

> 6. We commenced to design and manufacture the equipment. Part of the design process involved the conveying of information relative to the induction heating from the customer to us. *Part of the customer's data involved the recommendation of commissioning a vender (Pillar Corporation of Milwaukee, Wisconsin) for this apparatus with whom they were satisfied.* Pillar engineered the thermodynamics necessary to produce this induction heating function. Reliance was had upon Pillar Corporation to design, engineer and manufacture the induction heating apparatus needed to perform this function and Pillar and Kaydon were aware that it had to be adaptable to the machine manufactured by CAM.
>
> 11. In the construction and design of this machinery, reliance was had upon the expertise of Kaydon in the manufacture of the roller bearings, and reliance was further had upon the expertise of Pillar for development of the induction heating process. This reliance was predicated upon the strong recommendation by Kaydon and their encouragement to use this company.

Those statements and others were obviously intended to lay the groundwork for laying on Keene's doorstep any problems allegedly attributable to Pillar (to which problems much of the remainder of Tarzian's affidavit devoted itself).

Harestad's reply affidavit, though it too elsewhere shares all the vices of the "speaking affidavit," states flatly (Aff. ¶¶ 6, 7):

> 6. Subsequently, Chicago Automatic asked Keene if we knew of any other manufacturers besides Lepel that produced induction heating systems. We responded and provided Chicago Automatic with several names including Pillar, without recommending any one over the other.
>
> 7. Thereafter, we were informed that Chicago Automatic had chosen Pillar as its subcontractor to provide the induction heating system for the roller bearing machine contract. Mr. Tarzian then advised Keene, that he had "explained to Mr. Feldman [of Pillar] and his engineer, the requirements of an induction heating system to rotary continuous process (the process used by [Chicago Automatic])", (Tarzian 2 Aff., p. 2) and that Chicago Automatic had provided Pillar with the specifications for the system. It was our understanding that the completed heat induction system was to be separated from but connected to the roller bearing machine thereby allowing fabrication of each to proceed simultaneously.

It goes on to disclaim Keene's involvement with Pillar, seeking to counter Fidelity's obvious intention to tar Keene with the same brush.

If Tarzian's affidavit had recited specific facts that would support the conclusory

1. This Court has had some cases in which a lengthy affidavit (really a brief, replete with argument, citation of cases and other clearly non-testimonial material) looked like a thinly-disguised effort to get around this District Court's 15-page limit on legal memoranda.

[redacted]

characterization sought to be derived from it, a material issue of fact precluding summary judgment (after reasonable inferences were drawn in Fidelity's favor) might have been created (but see the text discussion of the legal significance of Pillar's position even on such an assumption). However, a careful reading of Tarzian's ¶ 6 exposes it for what it does not say as much as for what it does.[2] It *literally* does not conflict with Harestad's ¶ 6, though it obviously seeks to create a very different impression indeed. And to the discredit of Fidelity's counsel, his memorandum engages in a wholly unjustified compounding of that misleading connotation, converting it into Pillar's allegedly being Keene's deliberately chosen agent. For example:

> The building of the induction heating system was itself a highly technical matter and there was only one manufacturer in whom Kaydon reposed sufficient trust to manufacture this complex, but vitally important system. Keene introduced the Pillar Corporation of Milwaukee, Wisconsin ("Pillar") to build the induction heating system for the roller bearing machine.... (Fidelity Mem. 4)

> After a considerable period of time had passed, it appeared that despite Kaydon's expressed confidence in Pillar, the apparatus initially manufactured by Pillar would not work.... (*id.* at 4–5)

> Shortly thereafter, Keene's handpicked candidate to manufacture the induction heating system, Pillar, informed CAM and Kaydon that it was no longer interested in completing its contract and that if the non-conforming heating system it had supplied was to be utilized in the roller bearing machine, CAM and Keene

would have to adapt it by themselves.... (*id.* at 6–7)

Tarzian himself never went that far (see n. 2), and counsel is wholly unjustified in so reshaping Tarzian's actual statement. And the quoted examples from the memorandum's purported statement of "facts" are mirrored by the use to which counsel seeks to place them in the argument portion of the memorandum.

This whole problem is illustrative of why Rule 56 is drawn as it is. Tarzian would never have been permitted on the stand to make the conclusory characterizations his affidavit reflects—and if nothing else, cross examination would have made plain what the *testimonial* facts were. Because neither side's version conforms to the Rule, the Court has been provided with no real evidentiary *facts* in this area (and for that reason the rule of law about favorable inferences from the facts does not benefit Fidelity).

All that is left in the record, in the way of admissible evidence as to Pillar, is the uncontroverted simple statement in the text at n. 5. As a potential "genuine issue of material fact," it simply drops out of the case.

### On Motion for Reconsideration

Keene Corporation ("Keene") has sued International Fidelity Insurance Company ("Fidelity") to enforce two surety agreements, each of which guaranteed contract performance by Chicago Automatic Machine, Inc. ("Chicago Automatic").[1] This Court's December 3, 1982 memorandum opinion and order (the "Opinion") granted summary judgment on Counts 1 and 2, find-

---

2. Note the emphasized key sentence in Tarzian Aff. ¶ 6. Without the parenthetical identification of Pillar, it merely says Keene recommended that Chicago Automatic contract with an induction heating contractor with whom Keene was satisfied—a legally immaterial assertion in the context of this case. Does the parenthetical say (1) only that Keene was in fact satisfied with Pillar (the company Chicago Automatic chose), or (2) that Keene specifically recommended Pillar or (3) that Keene recommended *only* Pillar? That level of ambiguity

might or might not create a factual dispute with Harestad's affidavit—another reason Rule 56 requires an affiant to say only what he could testify to (that is, what Keene's representative actually *said* about Pillar).

1. Fidelity in turn filed a third party complaint against Chicago Automatic for indemnification. That claim has been stayed by Chicago Automatic's filing for bankruptcy reorganization under Chapter 11.

ing Keene entitled to recover the full amount of damages claimed in each count.[2]

Fidelity now asks for reconsideration of the Opinion in various respects. For the reasons stated in this memorandum opinion and order, its motion is denied.

### Facts

For present purposes only a brief recapitulation of the relevant events is necessary.[3] In October 1978 Keene contracted with Chicago Automatic for the purchase and delivery (by the week of March 26, 1979) of a 20-spindle rotary assembly machine (the "roller bearing machine") tooled to assemble Keene's roller bearings. Keene secured from Fidelity a performance bond that unconditionally guaranteed—up to $149,000—Chicago Automatic's performance under the roller bearing machine contract.

Early in February 1979 Keene ordered from Chicago Automatic a machine (the "thrust machine") tooled to assemble its unitized thrust bearings. Its completion was contemplated for the week of August 6, 1979. Again Fidelity issued a performance bond to guarantee Chicago Automatic's performance, but this time limited to the funds Keene advanced to Chicago Automatic.

Wracked by financial and production difficulties, Chicago Automatic failed to meet the initial delivery date under either contract. Over the ensuing months Keene acceded to Chicago Automatic's numerous requests for time extensions on both contracts. When Chicago Automatic's defaults continued despite the extensions, Keene demanded payment under the two performance bonds. Upon Fidelity's refusal to pay, Keene brought this action in the Southern District of New York.

### Procedural Background

While this action was pending in New York, Keene moved for partial summary judgment. Its motion sought the entry of judgment against Fidelity for "(i) $149,000 plus interest on [Keene's] first cause of action and (ii) $67,500 plus interest on [Keene's] second cause of action, and for such other and further relief as the Court may deem just and proper." Plainly the motion sought summary judgment as to damages as well as liability on both Counts 1 and 2.

Because the motion was fully briefed before the case was transferred here, the parties adhered to the local rules of the Southern District of New York. Local Rule 3(g) governs summary judgment motions:

(g) Upon any motion for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

In accordance with Fed.R.Civ.P. ("Rule") 56 and Local Rule 3(g), Keene addressed the issue of damages not just once but in three interrelated ways: by an affidavit as contemplated in Rule 56(c) and (e), by a memorandum of law in support of its motion *and* by its Local Rule 3(g) statement specifically saying damages were *not* a contested factual issue. Because that treatment controls

---

**2.** Keene's motion did not involve Count 3, which seeks punitive damages because of Fidelity's allegedly bad faith refusal to discharge its surety obligations. As discussed at the end of this opinion, Keene has now agreed to aban-

don Count 3 if it ultimately prevails on the first two counts.

**3.** Opinion at 2–9 offers a more detailed factual account.

to reject Fidelity's present efforts, it is worth detailing Keene's presentation.

For its Rule 56 affidavit, Keene tendered the sworn statement of Patrick Kirk ("Kirk"), Keene's Kaydon Bearing Division Vice President and General Manager. As to Count I's claim for lost profits—the only specific damage item now attacked by Fidelity—Kirk Aff. at 9–10 said:

> To date Keene's damages total $287,400, and are comprised of the following:
>
> \* \* \* \* \* \*
>
> (2) $187,920 in lost profits resulting from Chicago Automatic's failure to complete the roller bearing machine by the week of March 26, 1979, as contracted for. On or about March 1979, in contemplation of receiving the roller bearing machine from Chicago Automatic, Keene contracted with Chrysler Corporation, New Process Division, ("Chrysler") (Purchase Order 00–217–W09A) to provide Chrysler with fifty percent (50%) of Chrysler's roller bearing requirements for Chrysler's "208 Transfer Cases" used in four-wheel drive vehicles. (These transfer cases are supplied to American Motors Co., Ford Motor Company and International Harvester, among others.) During the period beginning July 1979 (four months after Chicago Automatic was required to complete the roller bearing machine contract) through December 1980, Chrysler ordered from Keene component parts (other than roller bearings) for 696,000 "208 Transfer Cases". Accordingly, had Chicago Automatic timely performed under the roller bearing machine contract, Keene, at a minimum, would have sold, at an average price of $1.17 per bearing, 348,000 roller bearings (50% of Chrysler requirements). Since Keene's standard costs per bearing is 63 cents, Keene would have received a gross margin profit (before taxes) of 54 cents per roller bearing sold. As a result, Keene's total gross margin profit (348,000 × 54 cents) would have amounted to $187,920.

Other portions of the Kirk Affidavit identified the remaining elements of Keene's claimed damages. In the aggregate the claim looked like this:

1. As for Count 1, the asserted damages of $287,400 (far in excess of the $149,000 maximum amount recoverable under the roller bearing machine performance bond) included (a) $187,920 in lost profits that would have been realized from the sale of roller bearings to Chrysler during the period July 1979 through December 1980; (b) $71,500 in advance payments ($33,750 of which was advanced almost six months after expiration of the initial performance date); (c) $13,000 in increased costs to obtain a substitute roller bearing machine; (d) $11,687 for legal fees attributable to this action; and (e) $3,743 in travel expense as well as additional labor costs.

2. As for Count 2, claimed damages were confined to the $67,500 advanced to Chicago Automatic for the thrust machine contract.

Together with the Kirk Affidavit and its legal memorandum, Keene filed its Local Rule 3(g) statement, specifically identifying its claimed damages as "material facts as to which there is no genuine issue to be tried":

> 11. Fidelity is indebted to Keene in the sum of $149,000 under the roller bearing machine performance bond and $67,500 under the thrust machine performance bond.

There is really no way in which the issue—or more accurately lack of issue—might have been posed more clearly.

In response Fidelity did precisely nothing. Its own responsive affidavit under Rule 56(c) was entirely silent on the question of damages. Its responsive memorandum never challenged (or even mentioned) Keene's damage claims or their evidentiary foundation. Most significantly (indeed dispositive on the issue), Fidelity's required responsive statement under Local Rule 3(g) itemized 19 "material facts as to which it is contended that there exists a genuine issue to be tried." Not one of those facts bore even tangentially on the question of damages. Under the specific terms of Local Rule 3(g), Keene's uncontroverted statement as to its recoverable damages was therefore "deemed to be admitted."

That then was the posture in which the case was transferred to this Court, with the summary judgment motion fully briefed and ripe for decision. And if that were not enough, Fidelity submitted nothing further when it had the opportunity—gratuitously afforded by Keene's counsel after the action was transferred here—to supplement the record with any materials it thought appropriate.[4]

In finding Fidelity liable on Counts 1 and 2 as a matter of law, the Opinion rejected its two affirmative defenses, which claimed (Opinion at 660):

1. Chicago Automatic's failure to perform both contracts stemmed from Pillar's [its subcontractor's] contractual defaults, which in turn must be ascribed to Keene because Pillar served as its agent in constructing the heating induction system.

2. Keene's failure to obtain Fidelity's consent to the time extensions relieved Fidelity of its suretyship obligations to the extent of its resulting injury.

Understandably given the uncontroverted state of the record, the Opinion held Keene entitled to recover the full amount sought on each Count. As to the lost profits component of Keene's damages on Count 1, Opinion at 666 n. 7 stated:

Neither the concept nor Keene's calculation of lost profits has been controverted by Fidelity. If Keene prevails on the legal question of Fidelity's discharge or non-discharge as surety, it is therefore entitled to judgment in full.

*Reconsideration*

Fidelity's motion for reconsideration (brought under Rule 59) advances three new grounds for setting aside the Opinion:

1. There is a factual issue whether Keene's acceleration of the payment schedule discharged Fidelity's surety obligations to the extent of those premature payments.

2. Three factual issues preclude the entry of partial summary judgment for lost profits on Count 1:

(a) whether recovery of lost profits was within the contemplation of Chicago Automatic and Keene;

(b) whether Keene proved its lost profits with a reasonable degree of certainty; and

(c) whether the claimed lost profits represent net or gross profits.

3. Election of remedies concepts bar Keene from recapturing both the monies advanced to Chicago Automatic and its lost profits.

In addition to disputing those legal theories on the merits, Keene strenuously opposes the use of Rule 59 to inject such new arguments into the litigation.

Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *See Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill. 1976). Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the summary judgment motion. *See Walker v. Hoffman,* 583 F.2d 1073, 1075 (9th Cir.1978), quoting *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972):

4. At this Court's behest upon receipt of the case, Keene's counsel Richard Hurwitz submitted all the pleadings and documents he believed relevant to disposition of Keene's summary judgment motion. His cover letter, a copy of which was sent to Fidelity's Chicago counsel, itemized the submissions and added:

Furthermore, the parties did submit some "sur-rebuttal" briefs and letters to the Judge after the normal briefing schedule on the motion for summary judgment. This was done without leave of the New York Court, and could not be done pursuant to our own local rules without leave of this Court. Accordingly, Keene has not submitted either International's sur-rebuttal materials, or Keene's sur-rebuttal materials.

Keene is willing to stand on the materials presented above, and have Your Honor decide the motion based upon the materials above. Should International Fidelity desire to submit the extraneous sur-rebuttal materials, or submit any other materials, we ask that they prepare a motion with the Court for leave to do so.

Fidelity never accepted that open invitation to expand the record or responded in any other fashion.

The non-movant has an affirmative duty to come forward to meet a properly supported motion for summary judgment:

> A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to "smoke out" the facts so that the judge can decide if anything remains to be tried.[5]

*Accord, W.A. Krueger Co. v. Northern Trust Co.,* No. 81 C 6064, slip op. at 7 n. 7 (N.D.Ill. Jan. 7, 1983) ("a litigant cannot 'hold back' evidence on a summary judgment motion"). Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time. *Evans,* 416 F.Supp. at 244.

Despite those established principles Fidelity seeks essentially to reopen matters as though the Opinion had not issued. Its counsel has said his failure to contest Keene's damage claims in both Counts 1 and 2 stemmed from a good faith belief Keene's summary judgment motion was confined to the question of liability. That position—if valid—might perhaps be the predicate for Fidelity's advancing its second and third new challenges to the Opinion (a subject dealt with shortly). In no event however can Fidelity justifiably make its first "new" argument, which focuses solely upon the Opinion's finding of liability.[6]

■ As for the second and third contentions—those dealing with damages—Fidelity will not be heard to claim the damages

issues were not encompassed within Keene's original motion. New York's summary judgment practice, and the history of this action recited earlier, are just too clear to permit that position. Because Local Rule 3(g) squarely and unequivocally operated as an *admission* by Fidelity as to Keene's damage claims, Fidelity cannot now seek to reopen the issues by the means it essays. *See United States v. Trans-World Bank,* 382 F.Supp. 1100, 1101–02 (C.D.Cal.1974) (applying that court's local rule closely paralleling Local Rule 3(g)).

Nor may Fidelity accomplish the same result indirectly, such as by challenging the sufficiency of Keene's factual submissions to support the damages it has claimed. After all a summary judgment motion is a substitute for trial in a situation in which the material facts are not in dispute. Summary judgment affidavits are treated as the equivalent of trial testimony (see Rule 56(e)). If an affiant expresses conclusions rather than evidentiary facts, and if those statements go unchallenged by the opposing party, the situation is no different from in-court testimony that takes the same form without objections by counsel.[7]

In sum, Fidelity has admitted Keene's damages in the full amounts of $149,000 on Count 1 and $67,500 on Count 2 (Keene's Local Rule 3(g) statement ¶ 11, quoted earlier) and that admission is still binding. In legal terms Fidelity has conceded the existence of uncontroverted facts that entitle Keene to recover all its claimed damages

---

**5.** Indeed, the last sentence quoted from *Donnelly* succinctly expresses the raison d'etre of Local Rule 3(g).

**6.** That argument is merely a variant of Fidelity's contentions on the most hotly contested proposition in the earlier briefing—Fidelity's affirmative defense that Keene's material alterations in both contracts with Chicago Automatic relieved Fidelity of its surety obligations. There is no excuse for a second chance at the issue now, and this Court adheres to its conclusions at Opinion 660. Indeed just this past month (after the parties had briefed the current motion) our Court of Appeals expressed serious reservations as to the general notion of excusing a surety by agreeing to modifications of the principal's obligations (though

no such doubt is required to support the decision reached here). *Argonaut Ins. Co. v. Town of Cloverdale, Ind.,* 699 F.2d 417 at 420 (7th Cir.1983).

**7.** No other rule would be fair to the litigant. Had Fidelity caviled (for example) at any of Kirk's affidavit statements as merely conclusory or otherwise insufficient in evidentiary terms, Keene would have had the opportunity to have cured the deficiency. Fidelity cannot now second guess the Kirk Affidavit submission on damages, any more than it could second guess the same kind of testimony if it had permitted such testimony to go in at trial without any objection.

once liability has been found. This Court so holds.[8]

### Conclusion

· Fidelity's motion for reconsideration is denied. Because Keene has now confirmed its willingness to forego its punitive damages claim under Count 3 if it is successful in recovering its full compensatory damages under Counts 1 and 2, this Court dismisses Count 3 without prejudice (so that all claims for relief are fully disposed of).

**8.** For that reason this opinion does not deal with the merits of Fidelity's new damage contentions. They are foreclosed whether the objections are stated in terms of lost profits theories or the election of remedies.