**Keith McKENZIE and Rev. Daniel Vinson, on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**The CITY OF CHICAGO, a municipal corporation, Richard M. Daley, individually and as Mayor of the City of Chicago, Cherryl Thomas, individually and as Building Commissioner of the City of Chicago, Ron McDermott, individually and head of the Fast Track Demolition Program of the City of Chicago, and John Does 1–20, Defendants.**

No. 97 C 284.

United States District Court,
N.D. Illinois,
Eastern Division.

June 24, 1997.

---

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Michelle Ann Weinberg, Edelman & Combs, Chicago, IL, for Keith McKenzie and Daniel Vinson.

Patrick Walter Johnson, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, Michael A. Forti, City of Chicago, Law Dept., Chicago, IL, Kenneth L. Schmetterer, Assistant Corp. Counsel, Litigation Div., Chicago, IL, Peter J. Donoghue, City of Chicago, Dept. of Law, Chicago, IL, for City of Chicago, Richard M. Daley, Cherryl Thomas, Ron McDermott and John Does.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In the wake of our recent decision granting the plaintiffs in this action a preliminary injunction, *McKenzie v. City of Chicago* (*"McKenzie I"*), 964 F.Supp. 1183 (N.D.Ill. 1997), the defendants (collectively, "the City") have moved for reconsideration or, in the alternative, a stay of the injunction pending appeal. Upon careful consideration of the parties' arguments, the newly submitted evidence, and the original evidence, the court denies the City's motion in its entirety.

At issue are one section of an Illinois statute, 65 ILCS 5/11–31–1(e), and a Chicago city ordinance, § 13–9–010 (collectively, "the Ordinance"), that permit the demolition of certain residential buildings through summary procedures. In Chicago, this summary demolition is overseen by the Fast Track Demolition Program, which is part of the city Department of Buildings. The Fast Track program has operated since approximately 1994, and currently accounts for the demolition of between 200 and 1000 buildings each year.

A building may be demolished under the Ordinance if it is "a residential building ... 2 stories or less in height ..., and the corporate official designated to be in charge of enforcing the municipality's building code determines that the building is open and vacant and an immediate and continuing hazard to the community in which the building is locat- ed." 65 ILCS 511–31–1(e). In assigning buildings to Fast Track demolition, the City focuses on the first part of this requirement, "open and vacant." The City believes that any building that is open and vacant—i.e., the interior is accessible to non-owners—is a likely shelter for gang members and criminals, and that the building therefore also meets the requirement that it be "an immediate and continuing hazard to the community." There is no evidence that the condition of the building plays any part in the decision to demolish. Rather, the criteria for demolition are: predominantly residential, two stories or less, vacant, and open.

The Ordinance requires the municipality to provide three forms of notice of its intent to demolish the building: the posting of a sign not less than two feet by two feet on the building; the mailing of letters to all record owners, beneficial owners of land trusts, and lienholders of record, by certified mail, return receipt requested; and the publication for three consecutive days of a notice in the newspaper. These notices must state that the municipality intends to "demolish, repair, or enclose the building, or remove any garbage, debris, or other hazardous, noxious or unhealthy substances" unless the owner does so himself within 30 days. 65 ILCS 5/11–31–1(e); Chi. Mun. Code § 13–9–010. The Ordinance does not define what is meant by "enclose," nor does it require that a municipality state its specific intent to demolish the building (as opposed to taking any of the other listed actions). The Ordinance does not require the notices to state the specific reasons why the building has been designated as "an immediate and continuing hazard to the community" or list specific actions that must be taken in order to avoid further municipal action.

Thirty days after the date of the last notice, the municipality may proceed with demolition. Afterward, the municipality may file a lien against the property for costs and expenses related to the demolition. 65 ILCS 5/11–31–1(e); *see also* Chi. Mun. Code § 13–9–010. The municipality may then move to foreclose on the property if necessary to enforce the lien. 65 ILCS 5/11–31–1(a); Chi. Mun. Code § 13–9–010.

The Ordinance provides that "[a] person objecting to the proposed actions of the corporate authorities may file his or her objection in an appropriate form in a court of competent jurisdiction." 65 ILCS 5/11–31–1(e); *see also* Chi. Mun. Code § 13–9–010. Since a municipality may commence demolition 30 days after issuing its three forms of notice, anyone wishing to file an objection apparently must do so within 30 days, although the Ordinance does not say this explicitly. There is no definition or explanation of what is meant by an "objection," what an "appropriate form" for it would be, or what a "court of competent jurisdiction" is, although the Ordinance later states that if "any person has sought a hearing under this subsection before a court and has served a copy of the complaint" on the mayor, the municipality may not proceed with demolition until the court issues an order authorizing it. *Id.* The Ordinance does not require that any of the three forms of notice inform the reader that he or she may seek a hearing by filing such an "objection," or that doing so will prevent any further action until a judicial determination has been reached.

The City's practice in implementing the Ordinance through its Fast Track program generally mirrors the fairly sparse requirements of the Ordinance. The City makes an initial determination that a building is open and vacant and therefore eligible for Fast Track demolition. It then compiles a list of those persons to whom mailed notice must be directed, as defined by the Ordinance; it sometimes adds the names of those who have recently purchased taxes for the property. If the property is still open and vacant at the next inspection, the City posts the required notice and also issues the mailed and published notices.

In general, these notices do not provide any information that the Ordinance does not require, so any of the Ordinance's failures to provide information are reflected in the actual Fast Track notices. As with the Ordinance, no notice is given of the City's intent to demolish (as opposed to enclosing, repairing or cleaning the property); the specific nature of the problems that led to the Fast Track designation; or what specific actions must be taken to prevent demolition. The exception is notice of the opportunity to file an objection; the letter and publication notices (but not the posted sign) state that the recipient has "the right to object to the City taking this action by filing legal action in a court of competent jurisdiction." The head of the Fast Track program, Ron McDermott, testified that if his office receives calls asking how to prevent demolition, he tells them that they must board up the building and that they may attempt to rehabilitate the property if they wish. He does not mention the possibility of seeking a hearing, and if callers have questions about the procedure for filing an "objection," he refuses to answer, telling them that he cannot furnish legal advice. McDermott dep. at 31.[1]

In the event that an owner or other interested person wishes to avoid demolition by boarding up or repairing the building, no guidance or assistance is forthcoming from the City. The City does not tell interested persons its standards for finding that a building is "secure," (i.e., boarded up), which require that the building be completely boarded up, without the smallest opening anywhere. The City does not identify any specific repairs that would be sufficient to remove the building from the Fast Track process—perhaps because, in the City's eyes, the condition of the building is almost irrelevant; what matters is whether it is vacant and open. The City has no formal procedures for recording information that a building is being worked on, for conducting

---

1. This court ordered the parties to submit citations to authority on the question of which party has the burden of proof in an "objection" proceeding under the Ordinance. Neither party identified any statutory authority that would resolve this issue. The plaintiffs noted that the only "objection" case they were aware of had been filed in the Chancery Court, and submitted case law holding that at Illinois law, plaintiffs (here, the property owners) bear the burden of proof in seeking an injunction—the type of remedy that would be sought here. The City testified that in two past "objection" proceedings, it presented evidence first and considered itself to have the burden of proof, but admitted that the decisions rendered in the two cases did not discuss the burden of proof. These two Chancery cases are apparently the only two "objection" proceedings that have involved an actual hearing.

checks on the building's progress, or for making an official finding that the work done is insufficient, and notifying owners or others that the demolition will proceed. Indeed, the City's informal procedures seem designed to frustrate attempts to avoid demolition. The evidence submitted by the parties shows that calls to the office are either not recorded or are not placed in the file for that building, so the City has no record of (a) the identity of a person concerned enough about the building to call; (b) how that person can be reached for future communications; (c) what work the person proposed to undertake; (d) what information was given to the person; or (e) any deadlines that may have been set or agreed to. Even written communications about Fast Track buildings—including letters stating an intent to rehabilitate, notices of new forwarding addresses for record owners, and copies of building permits for repairs—frequently do not find their way to the file or are discarded. It is difficult to imagine a system (we use the term loosely) less likely to permit interested persons to avoid demolition than the one shown by the evidence submitted this far.

Once the initial notices have been issued, the City provides no further notice of its intent to demolish, even if the Fast Track program has received communications indicating efforts to repair or enclose a building. Instead, it simply inspects the property 35 to 40 days after the dates of notice, and okays the building for demolition if it is not completely boarded up. Once a building has been approved for demolition, its destruction appears to be virtually certain. Although the demolition contractors are supposed to abstain from demolition and contact the City if they discover recent improvements or work in progress at a building, McDermott testified that this occurs only a "relatively small percentage of the time." McDermott dep. at 119.

The plaintiffs claim that the Ordinance—both as written and as applied via the Fast Track program—violates the Due Process clause of the Constitution. Their challenge to the Ordinance on its face includes arguments that its notice requirements and opportunity for a hearing are inadequate, and

that certain key language is unconstitutionally vague. The plaintiffs also claim that the City's procedures for implementing the Ordinance are unconstitutional, in that they increase the risk of erroneous deprivations of property. In *McKenzie I,* we found that they had met the requirements for a preliminary injunction of the Fast Track demolition process. The City asks us to reconsider our prior ruling and vacate it, or in the alternative, stay the injunction pending appeal.

### *The Motion to Reconsider*

■ In moving for reconsideration, the movant bears a heavy burden. The Seventh Circuit has repeatedly cautioned that:

> Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the [original] motion. . . . Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time.

*Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.,* 561 F.Supp. 656, 665–66 (N.D.Ill. 1982), *aff'd,* 736 F.2d 388 (7th Cir.1984)). "[M]otions to reconsider are not at the disposal of parties who want to 'rehash' old arguments." *In re Oil Spill by "Amoco Cadiz" Off Coast of France on March 16, 1978* [hereinafter *"Amoco Cadiz"],* 794 F.Supp. 261, 267 (N.D.Ill.1992), *aff'd,* 4 F.3d 997 (7th Cir.1993). As the above standards indicate, motions to reconsider should not be filed as a matter of routine by the party who has been adversely affected by a court's ruling. *See generally Jefferson v. Security Pac. Fin. Servs.,* 162 F.R.D. 123, 125 (N.D.Ill.1995). This court, just like the National Football League, has done away with the concept of "instant replay." *Id.* This court, just like all other courts, works diligently and strives carefully to issue its best opinion while deciding any motion. Nevertheless, a motion for reconsideration can perform a valuable function where

the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion for reconsideration would be a controlling or significant change in the law or facts since the submission of the issue to the Court.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990) (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va. 1983)).

The City contends that this court's earlier comments regarding the scope of the evidentiary hearing on the request for a preliminary injunction led it to believe that the court's review would be confined to the subject of whether proper notice of impending demolition was given to property owners. When, in our opinion granting the preliminary injunction, we considered issues beside the notice issue, the City argues that we "made a decision outside the adversarial issues presented to the Court." *Bank of Waunakee,* 906 F.2d at 1191. The City's argument is not strictly true, as the motion for a preliminary injunction clearly raised a number of legal theories and the parties presented a broad array of documentary evidence to us—evidence that suggested and supported our inquiry into non-notice issues. Nevertheless, in order to ensure that the parties were able to present preliminary evidence on all the issues that we ultimately considered in our opinion, we permitted full briefing of the motion to reconsider as well as the opportunity to present additional evidence. Those briefs and submissions of evidence have all been presented now, and we take them into account in reviewing the correctness of our earlier decision.[2]

As noted in our earlier opinion, there are several elements that must be weighed in considering whether to grant a preliminary injunction. Only one of these factors—the likelihood of success on the merits—is argued in the City's motion for reconsideration. The standard for success on the merits that must be met in order for a preliminary injunction to be granted is "some likelihood of success," which has been defined in this circuit as a "better than negligible" chance of success. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988). Thus, in order to induce the court to vacate the preliminary injunction, the City must demonstrate that the plaintiffs' chance of prevailing on the merits of their procedural due process claims[3] is negligible.

In evaluating the plaintiffs' procedural due process claims, the key question is whether the Ordinance, as written and as applied, provides all the process that is due before the City demolishes the plaintiffs' property. In order to answer this question, the Supreme Court directs that courts conduct a balancing test, the factors of which were laid out in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

**2.** The new evidence submitted by the parties includes: (1) affidavits by Building Commissioner Cherryl Thomas, City attorney Christopher Ditton, and Ron McDermott, submitted by the defendants; and (2) transcripts of depositions of Thomas and McDermott, an "Interim Report" on the Fast Track demolition program by the Landmarks Preservation Council of Illinois, and correspondence between the parties' attorneys regarding information stored in the computer used by the Fast Track office, submitted by the plaintiffs. The plaintiffs moved to strike the affidavits

of Thomas and McDermott as incompetent evidence. We denied the motion but granted leave to depose the affiants, despite finding that most if not all of the plaintiffs' objections to the affidavits were well-taken.

**3.** The plaintiffs have recently clarified that their Second Amended Complaint does not contain any substantive due process claims. Pls.' Resp. to Mot. Dismiss at 14 n. 6.

The consideration of these factors at this preliminary point in the case demonstrates that the plaintiffs indeed have a greater-than-negligible chance of prevailing on their claims. First, the private interest at stake is the irrevocable destruction of the plaintiffs' buildings, some of which have substantial emotional as well as economic value to the plaintiffs.[4] *See, e.g.,* Vinson dep. at 16 ("[I]t was something special about that building. I just loved it."). The Supreme Court has held that the length and finality of the deprivation are important aspects of this prong of the *Mathews* balancing test. *Gilbert v. Homar,* —— U.S. ——, ——, 117 S.Ct. 1807, 1813, 138 L.Ed.2d 120 (1997) (citing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982)). Here, the deprivation is both final and permanent.

Second, as demonstrated by our earlier analysis, the risk of an erroneous deprivation as a result of the procedures established by the Ordinance and the City is not trivial. The City argues that there are not so many errors as our first examination of the record seemed to find, but it has identified only three errors that should not be classified as such—the failures to provide mailed notice to anyone other than trustees at 1134 West 59th Street, 1234–44 North Kildare, and 1627 South Ridgeway.[5] Although the City argues that the other errors identified were not serious, it has provided no competent evidence to buttress this argument, despite an opportunity to do so. Even removing these three properties (and the two other errors that the City says it would have caught) from the calculation, the error rate is 6.36%. While this rate is not immediately horrifying, it still indicates that the Fast Track process erroneously destroys between 12 and 64 buildings each year, depending on the total number of demolitions. We cannot say that this showing—which is based on preliminary evidence only, not a complete record—suggests an insubstantial risk of an erroneous and final deprivation of an important property right.

Moreover, the probable value of additional procedural safeguards here is high. *See McKenzie I,* 964 F.Supp. at 1187. Although the Ordinance and the notices issued by the City state that property owners may avoid further City action by cleaning, enclosing or repairing their property, the City's current lack of formal procedures for overseeing these efforts creates a trap for the unwary, frequently resulting in unnecessary and erroneous demolitions. The establishment of a clear structure for supervising owners' rehabilitation efforts, and notifying owners of the City's evaluation of those efforts, would have substantial benefit in reducing mistaken or unwarranted demolitions. The use of a system for recording and filing communications from interested persons about specific properties, and for adding those persons to the list of parties receiving notice of a property's disposition, also appears likely to reduce the error rate by bringing those with some stake in the property into the circle of those to whom the City directs communications. The plaintiffs have suggested a third possible safeguard: automatically providing a hearing before a neutral third party at which interested persons may appear to contest demolitions. Such an automatic hearing date would likely increase the number of property owners or other interested persons who receive a hearing about the proposed demolition, and thus decrease the likelihood of possible error. "For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." *Fuentes v. Shevin,* 407 U.S. at 81, 92 S.Ct. at 1994

The City argues that it has incorporated several safeguards into its present system,

---

**4.** In recent years, some commentators have identified a backlash of sorts against the protection of "new property" (various types of governmentally-conferred benefits) under procedural due process principles. *See* Richard J. Pierce, Jr., *The Due Process Counterrevolution of the 1990s?,* 96 Colum L.Rev. 1973 (1996). Those philosophical debates do not apply to this case, which involves the procedural protections to be granted to "old"

property—i.e., individually-acquired property long recognized as being protected under the Due Process clause.

**5.** To clarify the record, the other nine "serious errors" identified in *McKenzie I,* 964 F.Supp. at 1187, relate to Defs.' Exs. 25, 34, 63, 66, 69, 70, 106, 108, and 109.

including reviews of the file at each step of the process, and again before demolition is ordered. While we do not doubt the City's good faith in carrying out these checks and reviews, they cannot substitute for a review by an impartial outsider in which the property owner can participate. Even if the City were able to eliminate all conscious and unconscious biases in its reviews, those reviews remain a "secret, one-sided determination of facts" that are "no replacement for the right to a prior hearing that is the only truly effective safeguard against arbitrary deprivation of property." *Id.* at 81, 83, 92 S.Ct. at 1994, 1996.

The final factor is the governmental interest involved. It is here that the City has truly failed to present evidence to support its arguments. On the record as it now exists, there is no evidence that safety concerns about infirm buildings motivate the City's current summary demolition procedures: instead, the head of the Fast Track program has testified that properties that present an immediate danger to the public because of structural damage or deterioration are not processed through Fast Track at all. McDermott decl. ¶¶ 12, 57. The plaintiffs' evidence also shows that on several occasions the City has demolished houses that had been rehabilitated, *see, e.g.,* Defs.' Exs. 102, 103; Third Decl. of John Wojcik, or that were in the process of active rehabilitation. *See* Am. Stmt. of Facts to Pls.' Reply in Supp. of Mot. for Prelim. Inj., Ex. F., Decl. of Rev. Vinson. Neither the Ordinance nor the City's Fast Track procedures require any finding that properties are a nuisance before they are eligible for demolition.

The City's focus is not the extent of deterioration of Fast Track properties, but whether the building is accessible in any manner. The City argues that it is right to focus on accessibility because open and abandoned buildings may become breeding grounds for criminal activity. While this argument has a certain intuitive appeal, the City has not provided any actual evidentiary support for it. Building Commissioner Cherryl Thomas' affidavit on this topic is based almost entirely

upon hearsay, and thus cannot be considered competent evidence. The advantages of summary demolition procedures as a crime-fighting tool are simply not supported by the current record.

Nor has the City shown that alternatives to Fast Track procedures, such as seeking orders of demolition in state court, are inadequate or burdensome. The City's only evidence about the adequacy of Demolition Court proceedings is the identification of one case that was filed in 1987 and is still pending. In the absence of any evidence about the total number of cases in Demolition Court or the average length of time until these cases are resolved, this solitary example of one old case fails to establish that Demolition Court proceedings are inadequate, or even that they are particularly slow.

Instead, the record suggests that the defendants' interests in expedited demolition may stem as much from political and economic incentives as from any objective needs. The removal of vacant buildings is very popular with neighbors, and provides a relatively inexpensive way to be seen as fighting crime. The individual defendants thus may have a political interest in the continuation of the Fast Track program. Demolition may also enable the redevelopment of the newly vacant lots at lower cost to the developers—excluding, of course, the owners of the demolished buildings who may have wished to rehabilitate and "redevelop" the building themselves. The City can potentially increase its revenues from property taxes. While there is nothing inherently wrong with these possible incentives for a summary demolition procedure, they must yield to the need to insure compliance with the dictates of the constitution. The law is clear that "Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." *Fuentes v. Shevin,* 407 U.S. 67, 90 n. 22, 92 S.Ct. 1983, 1999 n. 22, 32 L.Ed.2d 556 (1972).[6]

6. The remainder of this passage also bears repeating: " 'The establishment of prompt effica-

cious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in

Moreover, an adversary hearing before a neutral third party may be even more essential when the government has a direct pecuniary or political interest in the outcome. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 55–56, 114 S.Ct. 492, 502, 126 L.Ed.2d 490 (1993). Our review of all of these factors leads us to conclude that the plaintiffs have shown some likelihood of success under the *Mathews v. Eldridge* balancing test.

The defendants' motion is full of arguments about the incorrectness of our previous opinion. Many of these arguments only rehash their previous arguments, and thus are an insufficient basis for reconsideration. *"Amoco Cadiz,"* 794 F.Supp. 261, 267 (N.D.Ill.1992). For instance, the City's attempts to distinguish *McClendon v. Rosetti*, 460 F.2d 111 (2d Cir.1972), *after remand*, 369 F.Supp. 1391 (S.D.N.Y.1974), merely repeat arguments that this court has already considered. The cases that the City urges us to follow are equally inapplicable to the scheme presented by the Ordinance, if not more so, and we continue to believe that *McClendon* provides the best example of a similar scheme's compliance (or lack of compliance) with due process.

Nor are the City's factual arguments compelling. While those who are at risk of deprivation here may not always be the "uneducated, uninformed consumer[s]" described in *Fuentes*, 407 U.S. at 83 n. 13, 92 S.Ct. at 1995 n. 13 (and also posited in *McClendon*, 369 F.Supp. at 1394), it is undeniable that the property owners here face significant hurdles in availing themselves of the "opportunity for a hearing" permitted by the Ordinance. An owner seeking a hearing must first realize that he is permitted one—nothing in the notices required by the Ordinance tells him this essential fact. Indeed, it is quite possible that this deficiency itself renders the Ordinance's notice requirements unconstitutional. *See id.* at 80, 92 S.Ct. at 1994. Second, the owner must figure out what is meant

by an "objection" and where he is supposed to file it, a task that experienced attorneys would have difficulty with, and in which he is given no help at all from those responsible for enforcing the Ordinance. He must then assemble this "objection" and file it within 30 days of the date of notice. Even if he is able to secure legal assistance, such a speedy filing deadline would be difficult to meet. In the event that he is not able to afford the filing costs for his "objection," he must pursue the process to have those fees waived—a process that in the local courts could easily extend beyond the 30–day window the Ordinance allows. In light of the hurdles inherent in the Ordinance's scheme for allowing the property owner a pre-deprivation hearing, we remain firmly of the opinion that the plaintiffs have shown some likelihood of success in their challenge to the Ordinance as written.

■ Addressing the challenge to the Ordinance as applied, the City relies heavily on *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), arguing that any errors in the Fast Track process with regard to particular properties would render those demolitions "random and unauthorized," and thus state tort remedies are constitutionally sufficient process. There are several flaws in this argument. First, one of the most important reasons to provide meaningful pre-deprivation hearings is to prevent mistaken deprivations in the first place. On several occasions the Supreme Court has noted that the purpose of the Fourteenth Amendment's requirement of notice and a hearing "is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property." *Fuentes*, 407 U.S. at 80–81, 92 S.Ct. at 1994. *See also United States v. James Daniel Good*

constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency.... [T]he Due Process Clause in particular ... [was] designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may charac-

terize praiseworthy government officials no less, and perhaps more, than mediocre ones.' " *Fuentes v. Shevin*, 407 U.S. at 90 n. 22, 92 S.Ct. at 1999 n. 22 (quoting *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972)).

*Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 500–01, 126 L.Ed.2d 490 (1993) (quoting this passage). The current procedure for filing an "objection" is rarely used: thus far, the City has only identified two cases in which property owners have obtained full hearings by filing an "objection" as proposed by the Ordinance. It is a reasonable inference that the Ordinance's poor description of the objection process, coupled with the City's refusal to provide any information on that process, have discouraged property owners from seeking the hearing to which they are entitled.

Second, *Parratt* is not applicable here, where the deprivations of property that result from the Ordinance's implementation are foreseeable. *See Zinermon v. Burch,* 494 U.S. 113, 138–39, 110 S.Ct. 975, 990, 108 L.Ed.2d 100 (1990). Just as in *Zinermon, id.* at 134, 110 S.Ct. at 988, "[t]he very risks created by" the Fast Track program's procedures "are borne out by the facts alleged in this case," in which the City's lack of adequate procedures predictably resulted in some of the losses experienced by the plaintiffs. The fact that erroneous demolitions may be "unauthorized" in the sense that such demolitions are not the goal of the Ordinance is not dispositive; rather, the key question is whether, under the particular situation at hand, it is feasible to provide a pre-deprivation hearing. *Id.* at 138–39, 110 S.Ct. at 990. Because there is little question that improved pre-deprivation procedures could avert many of the erroneous demolitions of which the plaintiffs complain, the City's reliance on *Parratt* is misplaced.

The City's arguments in its motion are flawed, and the overarching principles that control the eventual outcome of this case—the *Mathews v. Eldridge* balancing test—indicate that the plaintiffs have a more than negligible chance of prevailing on the merits. Accordingly, we deny the City's motion to reconsider the grant of preliminary injunction.

### The Motion for a Stay Pending Appeal

 Failing in its bid to have us vacate our prior order, the City alternatively asks for a stay of the preliminary injunction pending its appeal. Such a stay may be requested pursuant to Federal Rule of Civil Procedure 62(c). "[T]he factors regulating the issuance of a stay are . . .:(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987). As the first part of this opinion indicates, the City has not met this standard. Indeed, the City did not bother to identify the applicable federal rule or the relevant test, present any arguments directed to their request for a stay, or cite any case law. The only references to a request for a stay pending appeal appear in the title of the motion and its one-sentence "conclusion." Nevertheless, a desire to avoid encountering the same request at a later date drives this court to address the City's motion for a stay on its merits.

In light of the evidence adduced so far, this court finds that the City has not met the first requirement, "a strong showing that [it] is likely to succeed on the merits." *Id.* Perhaps reasonable jurists could debate whether this standard has been met here. Even if a strong showing had been made, however, the City completely failed to identify, let alone document, any irreparable injury that it would suffer in the absence of a stay. The last two factors, the harm to the plaintiffs if a stay were granted and the public interest, either favor the plaintiffs or are neutral, as discussed in our earlier opinion. As the City's bare-bones request for a stay of the preliminary injunction pending appeal does not meet the requirements for such a stay, the court denies it.

The court denies the City's Emergency Motion to Reconsider or Alternatively to Stay Order of Preliminary Injunction Pending Appeal.