Keith McKENZIE and Rev. Daniel Vinson, on behalf of themselves and others similarly situated, Plaintiffs,

v.

The CITY OF CHICAGO, a municipal corporation, Richard M. Daley, individually and as Mayor of the City of Chicago, Cherryl Thomas, individually and as Building Commissioner of the City of Chicago, Ron McDermott, individually and head of the Fast Track Demolition Program of the City of Chicago, and John Does 1–20, Defendants.

No. 97 C 284.

United States District Court, N.D. Illinois.

May 5, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Michelle Ann Weinberg, Edelman & Combs, Chicago, IL, for plaintiffs.

Patrick Walter Johnson, City of Chicago, Law Department, Corporation Counsel, Michael A. Forti, Kenneth L. Schmetterer, Assistant Corporation Counsel, Litigation Division, Peter J. Donoghue, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In this lawsuit, the plaintiffs have raised various due process challenges to the validity of a Chicago city ordinance under which the defendants operate the Fast Track demolition program, claiming that they have been (or are about to be) deprived of their property without adequate notice or opportunity for

a hearing. The plaintiffs have filed a motion for a preliminary injunction to prevent the scheduled demolition of certain buildings and to enjoin the City of Chicago from carrying out the ordinance at all. On April 2, this court held an evidentiary hearing at which the parties chose to present written evidence. For the reasons stated below, we grant the plaintiffs' motion for a preliminary injunction, although we caution the plaintiffs that matters may be resolved differently at the permanent injunction or trial stage.

## RELEVANT FACTS

*The Ordinance*

Illinois statute 65 ILCS 5/11–31–1 sets out various options for local governments that wish to abate the problems created by "dangerous and unsafe buildings" and abandoned buildings. Under 5/11–31–1(a), the government may apply to the local circuit court for an order authorizing it to demolish, repair, or board up a building, or requiring the building's owners to do any of those things, if the owners have not taken sufficient action within 15 days after being sent notice of the problems. The mechanism for taking advantage of this provision in the City of Chicago is bringing an action in a court referred to as the "Demolition Court." This court is designed to provide an expedited process for hearing cases involving buildings that, in the City's opinion, require demolition.

A different subsection of the state statute, 5/11–31–1(e), permits municipalities to expedite even further the removal of residential buildings two stories or less in height that pose a "continuing hazard to the community in which they are located." The City of Chicago has enacted an ordinance, 13–9–010, that tracks subsection (e), and since at least 1994 has operated the Fast Track Demolition Program under the auspices of the ordinance and the city Building Department.[1] At the present time, the parties estimate that the

City demolishes somewhere between 200 and 1000 buildings every year through the Fast Track program.

The Ordinance requires three methods of providing notice to persons who may have a legal interest in the building. First, a sign not less than two feet by two feet must be posted on the building, informing the reader that the City has determined that the building is subject to demolition, repair or enclosure by the City unless the owner takes these actions within 30 days. Not more than 30 days after the sign is posted, a similar notice must also be sent via certified mail to all record owners, all beneficial owners, and all mortgage holders and lien holders. Finally, the City must publish a similar notice in a newspaper for three consecutive days. Thirty days after the latest of the dates of notice, the City may take action to demolish the building. The City has no authority under Fast Track to demolish buildings more than 120 days after the date of the first notice.

The Ordinance provides owners with some ways to avoid the destruction of their building. First, the owner may file suit to prevent the demolition. The Ordinance provides that once a person has served the Mayor with a copy of the complaint, the City may not take any further action with respect to that building until the court finds that such action is necessary to remedy a hazard and issues an order authorizing further action. The Ordinance states that the complaint must be filed in a "court of competent jurisdiction," without specifying any particular court or procedure which must be followed. There is no provision waiving or reducing the filing fees normally charged for filing a civil complaint.

Second, an owner may prevent the City from taking further action by himself remedying the problems that led to the City's placement of the building in the Fast Track program. All three forms of notice required by the Ordinance inform owners that they must demolish, repair or enclose [2] the build-

---

1. Because the ordinance is almost identical to subsection (e) of the state statute, we use the term "Ordinance" to refer to both the ordinance and 65 ILCS 5/11–31–1(e).

2. The letter and published notice, but not the sign, state that the owner may comply by secure-

ly boarding up all accessible windows and doors and keeping them boarded up. This is apparently what is meant by "enclose," although no formal definition of "enclose" appears in the Ordinance.

ing within 30 days in order to avoid the City taking further action. Owners wishing to repair or rehabilitate their building are not given any list of the specific defects that must be remedied. No standard that the building must meet is identified. For instance, there is no indication whether the building must be brought into compliance with the Chicago housing code, or if some lesser intermediate standard applies, what that standard is. Various Fast Track officials and employees have testified that the only factor they look to in determining whether a building is eligible for demolition under Fast Track is whether it is "vacant and open." Even if the Building Department has received communications from an owner stating that he is rehabilitating a building, the building may be demolished if it is open at the time of the final inspection (approximately thirty days after notice was given). A building must be completely sealed (boarded up) to avoid being designated as open, and therefore eligible for demolition. If the building is demolished, the City may recover the costs of the demolition from the property owner.

*The City's Account of the Fast Track Process*

The City's implementation of the Ordinance via the Fast Track program typically begins with a request to one of the City's 16 demolition inspectors to inspect a building that may be eligible for demolition. The Building Department may have received complaints about the building, or the building may have been identified as potentially eligible for demolition by a passing inspector. An inspector then visits the property for an initial determination about whether the building should be placed into the Fast Track demolition program. At this first visit, the inspector will examine the outside of the house, and generally the inside as well, and take photographs, marking the address and date on the photograph. Afterwards, the inspector will write up a report on the building, noting various aspects of the building's condition, including the state of the electrical and plumbing systems, the structural elements, and the external and internal walls and floors. A very rough estimate of the percentage of deterioration is made, and the inspector notes whether the building is va-

cant and open. The inspector will then complete a form either recommending that the house be processed for demolition through Fast Track or not. If the building is open, the inspector will generally recommend that it be placed in Fast Track, regardless of the extent of deterioration.

The inspection report, recommendation and photographs are then given to the inspector's supervisor, who decides whether the building should be assigned to Fast Track. Fast Track employees have testified that the primary factors considered in this decision are whether the building meets the formal requirements of Fast Track—it is at least 50% residential, and two stories or less—and whether it is "open" in the sense of being accessible by means of any opening in the building. If a building is not eligible for Fast Track, the supervisor may decide to refer it to some other part of the Building Department, such as the Demolition or Conservation divisions. Again, the general condition of the building is not a significant factor in this determination. Ron McDermott, who acts as the director of the Fast Track program, personally reviews all of the initial inspection reports and photographs of buildings slated for Fast Track to verify that the assignment is correct.

If a building is assigned to Fast Track, the administrative side of the process begins, as the Department prepares to give notice of the Fast Track process to interested parties. The first step is identifying the persons to whom the mailed notice should be sent. Building Department attorneys order title searches from a title company. Once the title search arrives, an attorney takes it to the Cook County Recorder of Deeds, where he uses the Sidwell plats to verify that the legal description and Property Identification Numbers are accurate. If there is a question about the proper address for the property, the attorney checks with the City's Maps, Graphics, Cartography Division of the Department of Planning and Development. The attorney who works primarily with the Fast Track program, Christopher Ditton, testifies that he attempts to resolve any remaining questions he may have about the nature of various parties' interests in the

property by consulting the "Realinfo" computerized database, which lists all transactions on a particular property. If he still has questions, he examines the actual documents on file at the Recorder of Deeds. When a land trust has an interest in the property, he contacts the trustee and requests the names of the beneficiaries, so that notice can be sent to them. For each property, the attorney also consults the Cook County lists of tax buyers for the years 1991, 1993, and 1995, to see if anyone has bought taxes for the property. In addition, the attorney notes the identity of the last known taxpayer for the property.

Once these records have been reviewed, the attorney assembles a "party list," on which he lists the names and addresses of all persons who may have a legal interest in the property. Typically, this list contains the names and addresses of the owners of record, mortgage holders, lien holders, the last taxpayer of record, and land trust beneficiaries. The list may also include tax buyers and anyone who has filed a petition or a Chancery Division case concerning the property. The addresses are taken from the deeds, and from the records of the last known taxpayer. Addresses for corporations are determined by consulting various corporate directories, the Recorder of Deeds grantor/grantee index, and addresses given on the deed.

Once the party list is prepared, the City is ready to proceed with placing the property into Fast Track officially. An inspector visits the house a second time, to verify that it is still eligible for Fast Track (i.e., still open), and to post the Fast Track sign. The inspector once again photographs the house, marking the location of the openings in the house that led him to find that the property was open, and photographing the sign upon the house. McDermott again personally reviews all of the photographs and recommendations from the second inspection. In the event that he determines that the building is not eligible for Fast Track at that point in time,

he may refer it to another division of the Building Department, or he may "monitor the file and possibly reinspect the property at a later date." McDermott decl. ¶ 22. In the event that Fast Track keeps the file open for "monitoring" and notices have not yet been issued for that property, McDermott states that the standard Fast Track notices are provided if and when the property once more becomes eligible for Fast Track.

At the same time (or sometimes even a day or two before this second inspection), the City prints up the letters of Fast Track notice to send to the persons listed on the party list. The letters warn that the property is subject to Fast Track demolition unless it is demolished, repaired or boarded up within 30 days. The letters, like the Fast Track sign and the Fast Track publication notice, refer to the ordinance and statute, and they also state that the recipient may "object" by "filing legal action in a court of competent jurisdiction." [3] The City mails these letters out by United States mail, certified and return receipt requested. There is no evidence in the record about whether the postal service forwards such letters; the envelopes are not marked "Please Forward" or "Address Correction Requested." McDermott testified that he believes that some of the letters may be forwarded. Letters returned to the City with different addresses noted on them are not re-sent to the other addresses, nor are those addresses used to update the party list. About this time, the City publishes in the Chicago *Sun–Times*, for three consecutive days, a notice listing a number of houses that are scheduled for Fast Track demolition. This notice lists the houses by address only; it gives no owners' names.

Owners or other interested persons sometimes contact the Fast Track program after receiving notice that a building is subject to demolition through Fast Track, to say that they are repairing the building, or that they have enclosed it. Callers are told that they

---

3. The sign does not mention the right to file an objection in court. McDermott testified that if people call to ask how they can prevent the demolition, he tells them that they can rehabilitate the property and that they must board it up.

He does not tell them that they can file a lawsuit to prevent the demolition. Moreover, if they ask him where to file such an action, he tells them that he cannot furnish legal advice. McDermott dep. at 31.

must keep the building boarded up to avoid demolition, and that an inspector will verify whether the building is boarded up or not. No record is kept of these calls. (Indeed, it does not appear that it is the practice of Fast Track employees ever to keep records of telephone calls.) McDermott testified that the process following such a call is that, at the next scheduled inspection (or at a fourth inspection if the owner contacts the City after the third inspection), the inspector checks to see if the building is boarded up or if repairs are being made. If not, the demolition is recommended without further notice to the owners.

The Ordinance does not set out any procedures to be followed in the event that a building is repaired or enclosed within the 30-day period. Ron McDermott, the person responsible for administering Fast Track, testified that in practice there are a number of options. If the building has been boarded up, he may refer the building to the Building Department's Demolition Division, which seeks court orders of demolition in the Demolition Court. Second, some buildings may be referred to the Conservation Division, which enforces the City's building codes. If the building is being repaired or renovated, it may be referred to the New Construction Division, which enforces City Ordinances relating to renovation or new construction. In some cases, typically because the owner himself has demolished the building, the building will be removed from Fast Track and the file will be closed. Finally, McDermott may decide to keep the building in the Fast Track program, but monitor the file and re-inspect the property at a later date. McDermott decl. ¶¶ 27–29. In the event that McDermott retains the building in the Fast Track program and monitors it, and later concludes that it should be demolished, he does not issue additional notice of the demolition to the owners and lienholders. In fact, once the initial notices have been sent out, the Fast Track program does not have any procedure for notifying owners about any of the dispositions made concerning their buildings. Owners attempting repairs, for example, are not given any formal notice about whether or not the repairs are sufficient to remove the building from the Fast Track program.

Between thirty and forty days after the last date of notice, an inspector conducts a third and final inspection. Once again, the inspector takes photographs and marks them to indicate any openings. In general, if the building is still open, the inspector recommends demolition. At this point, McDermott reviews the entire file to see whether demolition is appropriate. In addition to reviewing the photographs and reports to make sure that the building meets Fast Track's requirements, McDermott also checks for documentary evidence that all three forms of notice have been provided. If he does not find such evidence, he will halt the Fast Track process and instead re-initiate the Fast Track notice procedures. McDermott occasionally determines that, even though a building meets Fast Track requirements, it should not be demolished. In that case, he may have it boarded up by the City, or he may refer the property to the Chicago Abandoned Property Program (CAPP), a program that allows community groups to purchase buildings for their own uses. If he decides that demolition is appropriate, he notifies the City's purchasing department, which collects bids on the demolition job and selects a contractor. Demolition can occur from several days to several weeks after the Fast Track program issues the contractor its authorization letter.

The Fast Track office also receives telephone calls once the demolition has occurred. McDermott testified that it is "very common" for the office to get calls complaining about the demolition or saying "Why did you tear it down?" McDermott dep. at 3940. McDermott also stated that he is aware of at least ten wrongful demolition lawsuits against the City. *Id.* at 40–41.

*The Evidentiary Record*

The plaintiffs challenge the constitutionality of the Ordinance, both as written and as applied, saying that it causes deprivations of property without due process of law. For the facial challenge, the plaintiffs allege that the overall scheme created by the Ordinance does not provide for adequate notice or an opportunity to be heard. In their challenge to the Ordinance as applied, the plaintiffs point to specific cases where the City did not

give proper notice prior to demolition, and other cases where buildings were demolished despite the owners' rehabilitation efforts and the City's assurances that it would conduct additional inspections before approving demolition. As part of this challenge, the plaintiffs charge that the City frequently errs in assigning buildings to the Fast Track program, resulting in the needless destruction of buildings. The plaintiffs also appear to raise a substantive due process claim, alleging that the Fast Track scheme improperly permits Fast Track officials to make arbitrary and capricious determinations resulting in the destruction of private property.

In support of their positions on the request for a preliminary injunction, the parties have submitted evidence regarding the sufficiency of notice and other relevant aspects of several categories of properties: (1) properties belonging to the named plaintiffs, including those who recently moved successfully to intervene in this action; (2) the 76 properties for which Fast Track notices were issued on February 14, 1997; and (3) the last 25 buildings demolished in 1996. We review the evidence as to these properties below.

### Named Plaintiffs

### Keith McKenzie

Plaintiff McKenzie alleges that he was the owner of a house at 3834 West Fillmore Street in Chicago. He broke his ankle on September 9, 1996, and was hospitalized. Thereafter, he stayed with friends. The house at 3834 West Fillmore was demolished by the City under the Fast Track program in late September, 1996. McKenzie received no advance notice of the demolition. In response to these allegations, the City notes that McKenzie's interest was not recorded on the title and tax records it searched, and thus, it did not mail him notice. One Fast Track letter was sent to a former owner at 3834 West Fillmore; it was returned, marked "vacant." Def. Ex. 106. Photographs of the property taken in July, 1996, on the date that the Fast Track sign is reported to have been posted, do not show that any sign was posted.

### Rev. Daniel Vinson

Rev. Daniel Vinson and his wife owned a greystone building at 4107 West Adams Street. The building was a gift to the church of which Vinson is the pastor. In September 1995, a sign stating that the building had been placed in the Fast Track program was posted on the building. Vinson immediately contacted an attorney at the Legal Assistance Foundation of Chicago. The attorney wrote John Pope, who was then the Director of the Fast Track program, and also spoke to Ron McDermott, then Pope's assistant, on September 13, 1995. The attorney told the Fast Track officials that the property was being renovated, and they agreed not to demolish the property, but instead to monitor it. The officials allegedly said that if they "ever wanted to do anything more than monitor it," they would send notice by registered mail. Nothing in the file for 4107 West Adams reflects the above communications. Def. Ex. 105. McDermott testifies that he does not recall ever speaking with Vinson, and states that Pope left the Fast Track program in January, 1996.

Vinson obtained a rehabilitation and renovation loan, and began renovation. During the summer of 1996, the City began preparations to place 4107 West Adams in the Fast Track program again. The City performed a title search on July 8, 1996, which did not show any recorded interest by Vinson. The only Fast Track notices mailed out for the property were issued on July 19 and 26, 1996, and were based on the July 8 search. On August 29, 1996, the City performed a second title search, which disclosed Vinson and his wife as owners of the property. No mailed notice was sent to the Vinsons, however. McDermott does not know why the second title search was ordered, or why no letter was mailed to the Vinsons.

A second inspection was made and a Fast Track sign was posted on July 19, 1996. After he saw the sign, Vinson called the Fast Track office and spoke to someone who told him that the building would not be demolished. A final inspection was performed on September 5, at which time the inspector recommended that the building not be demolished because it was "secure" (boarded up).

This recommendation was overruled by McDermott on September 11, 1996. On September 12, 1996, the City authorized demolition and sent the demolition out to be bid. The City did not notify Vinson. The building was demolished on November 6, 1996.

*John and Beverly DeMarco*

The DeMarcos owned a house at 3748 South Wolcott. In past years, they had been in Housing Court for housing code violations. These were resolved, and the housing case was dismissed in October, 1995. Thereafter, the DeMarcos allege that they lived at 3748 South Wolcott during the summer, and lived in Florida during the winter. While they were in Florida, one or more of their adult children would sometimes live in the house.

On November 18, 1996, the Building Department received a request from the 11th Ward office to re-inspect 3748 South Wolcott. The house was reported to be abandoned and in violation of building codes. On December 12, 1996, a Fast Track inspector visited the house. He found that the building was "vacant and open," although there were also signs that someone was living in the house at the time—for instance, the living room light was on, and there was a substantial amount of personal property in the house. He also found that the house was structurally dangerous, as the support beam in the basement was dry rotted, as were the floors and joists. Photographs accompanied his recommendation for emergency demolition.

One week later, the City began to process the demolition recommendation. A list of the owners and other interested persons disclosed John DeMarco as the last known taxpayer, and that a land trust represented by the Marquette National Bank owned the house. On December 20, the Building Commissioner instructed the Department's Purchasing Agent to send the emergency demolition job out for bid. The demolition authorization notice was issued to the contractor on December 24, and the house was demolished on December 27, 1996. Def. Ex. 110.

At no time during this process were the DeMarcos notified of the impending demolition by the City. The DeMarcos were told of the demolition by a neighbor who saw it, and

John DeMarco arrived just as the demolition as being completed. The Department's administrative processes resumed on Monday, December 30, when it requested the names of the land trust beneficiaries from Marquette National on an expedited basis, and the bank faxed the DeMarco's information back to the City that same day. The record does not reflect whether the City then attempted to contact the DeMarcos after that. McDermott testified that this demolition was not part of the Fast Track program; rather, it was an emergency demolition. The City is not required to provide advance notice when a demolition is scheduled as an emergency.

*Wilburn Richards*

Wilburn Richards is the record owner of property located at 1224 West 51st Street, with a secondary address of 5055 South Elizabeth Street. An inspector found that the house and garage on the property were open, in poor condition, and that there was evidence of squatters. The Fast Track sign was posted on the house on February 11, 1997, and Richards signed a card indicating that he received the mailed Fast Track notice on February 27, 1997. Def. Ex. 1.

Richards is one of the plaintiffs who successfully sought to intervene in this action in order to move for a temporary injunction preventing demolition of the 76 properties identified in the February 14, 1997 publication notice. Richards states that he is diligently attempting to keep the property boarded up in order to avoid demolition under the Fast Track program. Photographs taken over a period of five days in mid-March indicate that, although the house is substantially boarded up, one or two windows on the upper floors are accessible, and the front door has been battered open. Graffiti has been added to one wall. The City has indicated that, although it will treat Richards' presence in this case as an "objection" sufficient to prevent demolition under the Ordinance, it intends to seek an order from this court or another permitting it to demolish the house and garage unless they are cleaned of debris and adequately secured.

*Robert Lewis and Honeywood Development, Inc.*

Honeywood Development, Inc. is a housing development corporation that buys properties in need of rehabilitation, rehabs them, and sells them. Dollars Express, Inc. is a former business name of Honeywood. At any given time, Honeywood has an inventory of 75 to 100 properties in development. It is common for Honeywood to buy certain properties as joint ventures with individual investors, and place the title in that investor's name but list their own address on legal documents. Honeywood also sometimes holds the title itself. At least eight Honeywood properties have been demolished by the City through its Fast Track program. Facts relating to these and other Honeywood properties are detailed below.

### 1. 6825 South Winchester

One property that has not yet been demolished, but is now in the Fast Track system, is located at 6825 South Winchester Street. The file reflects that this property was first noted as being open and vacant in 1993. Although photographs were taken at that time and a title search was prepared, the file does not show that any notices were sent or posted at that time. The property was reinspected in 1995, and the same steps taken, but again no notices were sent and there does not appear to have been any more action at that time. Def. Ex. 72. A transfer of title for this property was recorded on December 17, 1996, listing Robert Lewis as the owner and using Honeywood's business address.

In early 1997, the property was reinspected and designated for Fast Track. The Fast Track letters are dated February 13, 1997, and the Fast Track sign was posted the following day. Notice was mailed to Robert Lewis, both at 6825 South Winchester, and at 3938 West 111th Street, which is Honeywood's current address. The City received notice that the first letter was undeliverable because the address was vacant; the second return card for Honeywood's address stated that the letter had been delivered on February 25, 1997, although no one had signed the receipt. Honeywood states that its practice is to sign for all letters whenever requested, and to file letters such as this in the file for that property. It also has the practice of telephoning the City immediately if it receives notice of an impending demolition. Honeywood has no record of a letter for 6825 South Winchester in its files, and denies that it received any such letter.

Honeywood, which states that its properties are continuously boarded up and inspected at least once a week by its employees, also avers that it received no notice via any Fast Track sign posted at the house. Photographs in the City's file indicate that the sign was posted on February 14, 1997. Fast Track employees have testified that they do not know how long such signs stay up, and that about half the time the signs are gone by the time of the final inspection, approximately 30 days later. Photographs taken on March 14 and 20, 1997, indicate that the house has been boarded up and is now "secure" in the eyes of the Fast Track program, although one of the City's exhibits (a table summarizing the 2/14/97 publication-notice files) puzzlingly states that the third and final inspection has not yet occurred.

### 2. 944 West 53rd Place

This is one of the few properties as to which Honeywood received advance warning of demolition. Honeywood received a Fast Track letter about this property on March 16, 1996. Under the name of Dollars Express, one of its divisions, the company immediately sent a letter to the director of the Fast Track program (erroneously identified as John Pope), stating its intent to rehabilitate the property in the near future, and to keep it clean and secure until then. The same information was relayed to the City via a telephone call on March 20, and similar calls were placed twice on March 22 and once on April 1, 1996. Under the regular practice of the Fast Track office, no records were kept of these calls. McDermott has testified that sometime prior to demolition, someone from Dollars Express spoke with him and told him that the building was secured and was being renovated. The City's file for this property contains a letter received by the City on March 25, 1996 from Dollars Express, stating that the building was now vacant and secure. Def. Ex. 102. The City

told Honeywood that it was awaiting a final determination on the property.[4]

On April 10, 1996, Dollars Express received a building permit to repair 944 West 53rd Place, and telephoned Fast Track to relay this fact. A copy of the permit application, marked "OK to process," was sent to the Fast Track program and appears in the file. McDermott conducted the final inspection of the property on April 17, 1996, and concluded that it was open and therefore appropriate for demolition. Photographs from that date show that the building was almost completely boarded up, but that there was a small opening in one window. Bidding on the demolition work was authorized on April 22, 1996. On May 2, Dollars Express faxed a copy of its building permit to McDermott. McDermott did not respond to the fax or otherwise inform Dollars Express that the building was to be demolished. On May 29, 1996, the rehabilitation of the building was completed. Sometime between that date and June 2, the house was demolished.

Honeywood called McDermott on June 3, 1996 to inquire why the house had been demolished. McDermott stated that he could not find the file and would call Honeywood back. McDermott has testified that he meant to send another inspector out to the property to verify that it was secure and/or in the process of rehabilitation, but "[u]nfortunately, before I was able to do this, the contractor began to demolish the building." McDermott Decl. ¶ 59. On June 5, 1996, McDermott belatedly sent a fax to the contractor ordering him to stop the demolition. His reason for doing so is unclear from the record, as Dollars Express had already informed him that demolition had occurred. Several weeks later, Dollars Express received a letter from McDermott stating that the demolition contractor failed to follow strict City policy and procedure in demolishing the property.[5]

### 3. 1233 West 109th Street

This property was owned by Honeywood in conjunction with a private investor, in whose name the deed was recorded. Unfortunately, that deed showed the address as being 1235 West 109th, an address that does not exist. After inspecting the property and deciding to place the house into Fast Track, the City searched the title and tax records for the addresses 1231 and 1233 West 109th (the correct addresses for the property), and mailed notices only to the persons listed for those addresses. The City also posted a sign on April 16, 1996, and published notice for the property on April 18–20, 1996. The house was demolished in July, 1996.

The plaintiffs question the thoroughness of the City's efforts to provide notice to the property's owners. For instance, they note that the photographs taken at the preliminary inspection on February 14, 1996 show a large Dollars Express sign on the front of the house. The sign listed Dollars Express' address and telephone number. This information does not appear to have been taken down on the inspection form, nor is there any indication that anyone from Fast Track ever attempted to contact Dollars Express about the property. Photos from subsequent in-

---

4. The file reflects that this property was inspected and photographed twice during the year before, in March 1995 and again in May 1995. The May inspection resulted in a recommendation that the property be placed into Fast Track, and notices were send to the interested parties, including the U.S. Department of Housing and Urban Development, the owner. Photographs taken in June 1995 show that the house had been securely boarded up, and the property was taken out of Fast Track with a notation to monitor it.

5. McDermott notes that the letters authorizing the contractors to demolish Fast Track buildings state: "**If there appears to be work in progress at the above site or if the building is boarded and secure, you *must* contact Fast Track Demolition, at (312) 744–3422, to obtain permission to proceed with the work.**" McDermott admits, however, that contractors actually call a "relatively small percentage of the time." McDermott dep. at 119. The plaintiffs suggest (thus far without proof) that contractors may be paid by the City only if they demolish a building. If that were the case, and perhaps even if it were not, it would be unreasonable for the City to rely on contractors to provide a final safeguard against demolishing buildings that are boarded up or have been substantially repaired. It is also unclear whether the City's duty to ensure that it does not needlessly demolish buildings is delegable to its contractors. At this point, the City has not formally raised the above language as a defense, and the Court thus declines to address this possible argument.

spections are taken at angles that do not show the front of the house or the location of the Dollars Express sign. Moreover, the plaintiffs note that the inspector who made the preliminary inspection apparently wrote down 1235 as the address, then went back and corrected it later. Another notation to "1235" appears in the file as well, and notations on the title search indicate that the legal description, PIN, and common address "do not match." Def. Ex. 103. Nevertheless, the City apparently did not attempt to search the title and tax records for 1235 West 109th Street.

Finally, Honeywood testifies that the house was being rehabbed during this period. The City's final inspection was performed on May 21, 1996. The photograph from that date shows no obvious rehabilitation efforts. An undated photograph submitted by the plaintiffs shows, however, that at some point before the demolition on July 30, 1996, the house had received new siding, windows and doors, and in general sported a nice appearance. Honeywood states that it had tenants who had agreed to lease the building and were planning to move in shortly. The contractor demolished the house despite the presence of the fresh repairs.

#### 4. 1114 West 115th Street

The City placed this property in the Fast Track Program on November 15, 1996, posting the Fast Track sign that same day and mailing the notice letters soon after. Def. Ex. 104. Letters were mailed to Janusz Loboz, the investor listed as the owner of this Honeywood property, at three addresses: 1114 West 115th Street; the address given in connection with Loboz' last tax payment; and the old Honeywood address at 11722 South Western Avenue. The letter addressed to Honeywood's address was forwarded to their new address, where the post office marked it as having been delivered December 20, 1996, although there is no addressee signature on the card. Again, Honeywood testifies that it did not receive this letter. One of the other letters addressed to

Loboz was signed for by him. At the final inspection on December 16, 1996, one door to the house was found to be open and demolition was approved. The house was demolished on January 7, 1997.

#### 5. 6612 South Aberdeen

Honeywood received a Fast Track notice letter from the City concerning this property shortly after August 8, 1996. Honeywood sent a certified letter back to Fast Track on August 20, 1996 (presumably the usual Honeywood form letter advising the City that Honeywood had secured the building and was in the process of rehabilitating it, although this is not stated). A few months later, about October 31, Honeywood received another Fast Track notice about 6612 South Aberdeen. Honeywood again responded by certified mail; the letter was dated November 14, 1996. Honeywood states that the property was monitored frequently to ensure that it stayed boarded up, and that the building was in the process of being repaired and rehabilitated. On April 9, 1997, Honeywood learned that the building had been demolished.[6] Honeywood's testimony that it checks all of its properties at least weekly, in conjunction with the early April date that the demolition was discovered, suggest that the demolition was carried out over 120 days after the date of the City's notice to the property's owners.

#### 6. 8716 South Mackinaw Street

There are multiple defects in the file for 8716 South Mackinaw. The initial inspection report, which is performed to indicate whether a building should be considered for Fast Track, found that the building was vacant and secure on September 6, 1996. Def. Ex. 109. McDermott testified that he would not refer such a building to Fast Track, because it was not open. Nevertheless, the Fast Track process—identifying interested parties so that notices could be sent and scheduling future inspections—was put in motion.

**6.** Honeywood learned of this demolition on April 9, 1997, and included it as a late addendum to their rebuttal evidence filed with this court the same day. Because none of the parties anticipated that 6612 South Aberdeen would be at issue

here, no City file was submitted for this property. This account is thus drawn solely from the affidavit testimony of John Wojcik of Honeywood. The Court weighs its probative value accordingly.

McDermott explained this as "simple human error." McDermott dep. at 127.

The second inspection, at which the inspector checks to make sure that the property is still eligible for Fast Track and posts the Fast Track sign, was performed on October 29, 1996. The photographs from that date suggest two puzzles. First, unlike almost all of the other photographs from second inspections, these photographs do not show that a Fast Track sign was posted on the property. It is of course possible that a sign was posted but not photographed; the photographs are head-on shots of the front and back of the house, however. Second, although there is a circle on the photo of the back of the house to indicate an opening, the photo (which is taken from a distance) does not actually show an opening. Reviewing this photo, McDermott testified that only the circle, not any actual opening that he could see, led him to believe that the house was open at this inspection. The inspector also made a written report that the house was vacant and open; no details are given. Shortly after the second inspection, Fast Track notices were mailed out. One of the mailed Fast Track notices was sent to Honeywood under the name of the private investor for the property, but it does not appear to have been delivered.

The final inspection before the property was slated for demolition occurred on February 3, 1997. At that inspection, a back window that appears to be partially open is circled as proof that the house was considered open. This is not the same location marked as open at the second inspection. Otherwise, the house appears to be in good shape.[7] Demolition was authorized on February 18, 1997, over 120 days after the last date of notice. The house was demolished some time after March 10, 1997.

### 7. 5350 South May Street

This property was first inspected and designated for Fast Track on November 5, 1996. Fast Track notices were sent out on or about December 19, 1996, including one addressed to Arnold Gillard, a one-time Honeywood employee, at Honeywood's old address. There is no indication that Honeywood received the letter; rather, it was returned to the City marked "Forward to (Honeywood's new address)." The property had been transferred before demolition, and the new deed (which listed John Wojcik at Honeywood's present address as the owner) was recorded on December 12, 1996. Unfortunately, although the Fast Track letters were not sent out until December 19, the search had been done almost a month earlier, on November 21, 1996.

No sign of any second inspection appears in the file. Def. Ex. 108; Pl.Ex. 6. Thus, there is no evidence that a Fast Track sign was posted, or that the building was still eligible for Fast Track at that time. The final inspection occurred on January 22, 1997, at which time the inspector noted openings in two windows and recommended demolition. The house was demolished sometime in February, 1997.

### 8. 6822–24 South St. Lawrence Street

There was a fire at this property, a brick two-flat, in April, 1996. On April 24, 1996, the property was inspected by a Building Department inspector, who recommended demolition. Def. Ex. 107. The Department issued an authorization for emergency demolition on April 25. No notice of the demolition was given. In early May, Honeywood workers visited the building, the exterior of which was relatively intact, and boarded it up. Shortly thereafter, the building was demolished. Because the building's demolition was designated as an emergency, it was not performed through Fast Track.

### 9. 6003 South Throop

As with 6612 South Aberdeen, Honeywood claims that this property had been substantially rehabilitated by Honeywood shortly before its recent destruction. Honeywood received the first mailed Fast Track notice on

7. The only evaluation of a building's condition is done at the first inspection; later inspections generally check only whether the building is open. The only problems noted on the first inspection report for 8716 South Mackinaw are: "Defective front porch with missing members, no electric." The report is marked "partial"; McDermott testified that he has no idea what this means.

this property in early June, 1996.[8] Honeywood sent a certified letter to the Fast Track program on June 7, 1996, stating that they would be making repairs and enclosing the building. A few days after November 14, the lender for the property received a new Fast Track letter, which it forwarded to Honeywood. Honeywood sent its usual certified letter to the City; the lender wrote a similar letter. Honeywood heard nothing further from the City about this property. On April 9, 1997, Honeywood discovered that it had been demolished.

### 10. 6618 South Wolcott Avenue

This is one of the buildings that Honeywood recently discovered was scheduled for demolition, but that has not yet been demolished. It is unclear why this building was originally designated as a candidate for Fast Track (there is no record in the file), but on February 14, 1997, it was found to be open and a Fast Track sign was posted. Def. Ex. 73, Pl.Ex. 2. Fast Track letters dated February 13, 1997 were mailed out, including one to Honeywood's old address bearing the name of a private investor, which was returned without delivery. There was an interim inspection on February 27, after which the inspector completed the evaluation form that is usually filled out at the first inspection, before the sign is posted. The final inspection took place on March 18, and the house was approved for demolition. The demolition process has not gone any farther because this property is one of the subjects of the pending motion for a preliminary injunction.

### 76 Properties—Demolition Notice Published 2/14/97

On February 13—15, 1997, the City published a notice in the newspaper that the 76 properties listed there were subject to demolition through the Fast Track program unless the owners took action to repair, enclose or demolish the buildings. For ease of reference, the parties refer to these properties as "the 76 properties" or "the 2/14/97 properties." The plaintiffs contend that the City must be enjoined from demolishing these or any other buildings through Fast Track until the constitutionality of the Fast Track program as enacted and as applied is determined. The City responds that there is no need for such an injunction, and offers up its files on these 76 properties [9] as proof that no unconstitutional deprivations would occur if it were permitted to continue Fast Track demolition. Upon reviewing these files, the Court has found the following.

### Clear Errors

Thirteen of the 76 files show some type of real error, either in the process of making decisions about the house's eligibility for Fast Track, or in the documentation of that eligibility and the proof of notice to owners. Three of these are "address inconsistencies" that were caught by the City in the course of its regular procedures. Def. Exs. 46, 47, and 74. Two other problems in the mail notice provided to owners were found by McDermott while he was readying the files for production to this court. Def. Exs. 66, 69. In File 66, the City had failed to send a Fast Track letter to the record owner at that owner's listed address. In File 69, no letters had even been printed up, although the second inspection showed that the house was open, and the City therefore was pursuing its demolition. McDermott maintains that he would have caught both of these errors at his final review of the files prior to authorizing demolition.

Eight other errors were not caught by the City. In Def. Ex. 5, the file for 1134 West 59th Street, the title search revealed that a bank was the trustee for the property. Nothing in the file reflects any effort to

---

**8.** As is the case with 6612 South Aberdeen, the discovery of the demolition was too recent to permit the parties to produce a copy of the City's file. Instead, Honeywood has produced the contents of its own file on this property, and the affidavit of John Wojcik, from which this account is drawn. As with 6612 South Aberdeen, the Court weighs carefully this one-sided account.

**9.** Four files were "eliminated" by the City before they were produced to this court. The City admits that three of these contained errors, which it describes only as "address inconsistencies." The fourth file was for a property where the garage was subject to Fast Track demolition, and the owner demolished it himself. As we cannot review that file, we do not assume either that it contained errors or was error-free.

locate the beneficiaries of the trust, despite testimony by a City attorney that such efforts are his usual practice. Thus, the party list for mailed notices is deficient.

In Def. Ex. 27, the file for 5347 South Hermitage, the inspector appears to have photographed the back of the wrong house in making his first inspection. The house back pictured, which does not appear to be the back of the house at the address he was inspecting, has several openings that provided the basis for his finding that the house was "open" and his recommendation that the house be placed into Fast Track. Fortunately, at the second inspection the inspector photographed the back of the right house, found that there were no openings, and reported that the house was no longer eligible for Fast Track because it was secure.

The photographs from the first and second inspections for 262 North Keeler, Def. Ex. 34, show two completely different buildings. There is no indication which set of photographs depicts the real 262 North Keeler, or whether the Fast Track sign was posted at the correct address. In the file for 1210 West 110th Place (Def.Ex. 11), the recommendation form for the second inspection is marked to show that the house is vacant and open, but the photograph taken at that inspection does not support the "open" certification: no openings are either marked or visible.[10]

The files for 10741 South Glenroy, 664244 South Talman, and 6934 South Wabash (Def. Exs. 25, 63 and 70 respectively), evidence worrisome lapses in correctly identifying which building is demolishable when the property has two buildings on it. In Def. Ex. 25, the overall report from the first inspection states that the property is open, but a more detailed look at the inspection forms shows that only the garage in back, not the

house in front, is reported to be "open." Other inspectors and administrators do not appear to have picked up on this distinction. The second inspection also yielded an overall designation of "open," although no openings are shown in the house. Nothing in the Fast Track letters or published notice reflects that only the rear garage is subject to demolition. Unless this overly broad designation were somehow corrected, there is a substantial risk that the house would be needlessly demolished along with the garage. Similarly, the file for 664244 South Talman shows that at the first inspection only the garage was found to be open and was recommended for the Fast Track program. The house in front was secure. Because the second inspector seems to have focused only on the condition of the house in front, the second inspection resulted in a finding that the property was not open and a recommendation that demolition not be pursued. Finally, in Def. Ex. 70, the rear building was once again the only one found to be open at the first inspection and the only one recommended for the Fast Track program. The second inspector seems to have picked up on this, as only the rear building was photographed and posted with the Fast Track sign at the second inspection. None of the Fast Track letters or the published notice reflect that only the rear building is subject to demolition, however. While one would hope that the form eventually authorizing the demolition would be more specific, the evidence does not support such an assumption.[11]

The error in Def. Ex. 15 is a clear one, but it was ultimately harmless due to the City's procedures for checking. The first inspection of that building, 402 North Avers, found the building to be secure. Nevertheless, it was erroneously put into the Fast Track

10. Our review of over a hundred Fast Track files suggests that one building inspector in particular produces problematic inspection reports. Although the recommendation form for the second inspection requires the inspector to take photographs of the front and back of the building and mark a circle around any openings that support an "open" report, this inspector routinely provides only one, unmarked photograph. This same inspector almost always notes on first inspection forms that a "drugs dealer" or "vandal"

is "in and out" of the building. The almost inevitable presence of these comments on every first inspection form, and the fact that he is the only inspector who includes such comments, tends to undermine his credibility.

11. Some Fast Track letters and publication notices do include a "rear" or "garage" designation, so it is not impossible to indicate that only the rear building is subject to demolition.

program,[12] and a party list was compiled in anticipation of issuing Fast Track letters. On the second inspection, the building was once again found to be secure, so the Fast Track procedures were stopped and the building was referred to the Conservation division.

*Inconsistencies*

Five of the 76 files show problems that are not flat-out errors, but inconsistencies. While these types of problems by themselves are unlikely to lead to the improper destruction of property, they point up the subjective nature of City employees' determinations about whether to proceed with Fast Track, unclear or insufficient documentation of changes in a building's appearance, and the possibility of more serious error.

Several of these inconsistencies suggest that different inspectors interpret the same conditions in different ways. For instance, in Def. Ex. 10, the property was designated "open" at the second inspection, although no openings were visible or marked on the photograph (*see supra* note 10); the same property was found to be "secure" at the third inspection, although the photographs do not reflect any obvious changes from the second inspection. The file for 5537 South Seeley (Def.Ex. 61) is similar. The first and second inspections designate the property as open, while the third designates it as secure, but the photographs show no visible changes. For Def. Ex. 30, although both the first and second inspection reports stated that the house was open, Fast Track officials apparently believe that the house is now secure,

although there is no basis for this in the file. The table submitted by the City summarizing the status of the 2/14/97 files states that this property was "Secure at 2nd inspection," and no Fast Track letters were sent out, nor was any Fast Track sign posted.

Other inconsistencies simply present puzzles. In Def. Ex. 43, the photograph taken at the first inspection shows a Fast Track sign on the door. Fast Track signs are not normally posted until the second inspection, when the City is ready to issue its other forms of notice as well. A notation on the photograph says "did not post." If the first inspector did not post the sign, who did? And if the sign comes from some earlier, aborted Fast Track effort for this property, why is there no record of that effort in the file? The last puzzle relates to Def. Ex. 75, in which an extra set of photos of the house marked "1/10/97" show that the house is boarded up, yet photos taken at the first Fast Track inspection on January 12, 1997 show that the house had not yet been boarded up. Later Fast Track inspections show the boarding. Apparently, the date on the first set is a mistake. It is also unclear whether City employees or someone else took the photos. There are no other signs of correspondence from any third party in the file.

*Incomplete Files*

This is the last category of irregularities that appear in the 2/14/97 files.[13] They are generally harmless. For instance, Def. Exs. 12, 13, 23, 32, 40 and 42 show no evidence

---

12. It may be recalled that the same type of error was made with 8716 South Mackinaw.

13. A few other files show situations that cannot really be called "irregularities," since they are in line with the City's normal Fast Track procedures, but they suggest potential problems of notice. Def. Ex. 39 contains a Fast Track certified letter that has been returned to the City with the addressee's (the property's record owner) new address listed. There is no evidence of forwarding by the postal service. The file also contains an approved application for a building permit to repair the property, which also reflects the owner's new address. Nevertheless, it does not appear that any notice has been sent to the owner at her new address. Thus far, the property has been designated "open" and remains subject to future demolition.

Def. Ex. 22 contains a note: "6351 S. Eb. [the property's address]—Request to be nonsuited— was so on 2/4/97." The person who made this request is not identified, and there is no other reference to this note in the file. The property was found to be open at the second inspection and is presently considered eligible for demolition.

It should also be noted that in many of the 76 cases, Fast Track notice was published before the second inspection (which theoretically is what results in the decision to give the notice) occurred. In at least 27 of these cases, the City decided not to proceed further in Fast Track. The impact of the misleading notice of impending demolition on owners of these 27 properties, assuming that any of them saw the published notice, is unclear at this point.

that a second inspection was performed, although the Table provided by the City states that all of these properties were found "Secure at second inspection." Since the properties are considered secure by the City and are not presently subject to demolition, the lack of these second inspection forms and photos is presumably harmless. Nevertheless, their absence is troubling. The file for 2728 South Ridgeway (Def.Ex. 60) has an inspection form from the second inspection marked "secure" but the photos attached to it are from the first inspection. That file, and Def. Ex. 14, are also missing any party list, although copies of the title search are in the file. In the case of Def. Ex. 14, letters appear to have been prepared and sent to everyone with a legal interest in the building. The last incomplete file, Def. Ex. 73, shows no first inspection, so the basis for the decision to begin the administrative title and tax search process is unclear.[14]

*Summary*

A careful review of the 2/14/97 files shows that a total of at least 28 of 76 files were flawed in some way, whether by missing documentation, inconsistent Fast Track decisions, or plain mistakes. The City states that it either found or would have found five of these errors itself. While many of these flaws were harmless, as the City eventually decided not to pursue demolition for many properties in this group, at least seven serious flaws (apart from the ones caught by the City) appear in files where the City is currently seeking demolition of the house.

*Last 25 Properties Demolished in 1996*

For the purposes of presenting evidence relevant to the motion for a preliminary injunction, the parties have submitted a second group of files as well: the files for the last 25 demolitions authorized through Fast Track in 1996. We have carefully reviewed these files in the same manner as the 2/14/97 files. Out of a total of 25 files, we found two files

(Def.Exs. 87, 95) with errors, both of which must be categorized as serious errors in the notification process. In both cases, the attorney compiling the party list failed to contact a listed trustee for the names and addresses of the land trust's beneficiaries. These omissions may well have led to those with a beneficial interest in the property not receiving one of the required forms of notice—the Fast Track letter. No other errors appeared in this group of files.

## LEGAL STANDARDS

In order to prevail on their motion for preliminary injunction, the plaintiffs must show (a) some likelihood of prevailing on the merits, and (a) an inadequate remedy at law and irreparable harm if the preliminary injunction were denied. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1291 (7th Cir.1996). At the preliminary injunction stage, plaintiffs meet the first test if they have a "better than negligible" chance of success on the merits. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988). If the plaintiffs can meet these first two tests, the court must then consider the balance of harms, i.e., the irreparable harm the nonmovant would suffer if the preliminary injunction were granted balanced against the irreparable harm to the movant if relief is denied, and the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Grossbaum*, 100 F.3d at 1291.

## ANALYSIS

### I. LIKELIHOOD OF SUCCESS ON THE MERITS

The first and most important element of a preliminary injunction is the likelihood of success on the merits. "If it is clear that the [movant] has no case on the merits, the injunction should be refused regardless of

---

**14.** Interestingly, four files (Def. Exs. 16, 21, 43 and 56) have copies of correspondence from third parties (typically either mortgage holders or property management contractors for HUD) "in response" to some notice about the property. This is unusual because there is no evidence in the files that any notice except the publication notice had been issued for these properties. Perhaps these parties represent the few diligent souls who actually read the copious notices published in the newspapers on a daily basis, or perhaps some mailed notice was sent but copies are not in the file. We consider these files possibly but not definitely incomplete.

the balance of harms." *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir.1993). Because this element depends on the particular claims being advanced, we evaluate the support for each of the plaintiffs' claims separately.

### A. Procedural Due Process— Facial Challenge

■ The Due Process clause of the United States constitution provides: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const., art. XIV § 1. "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233, 17 L.Ed. 531 (1863)). There are some refinements to this "notice and an opportunity to be heard" requirement.

First, as pointed out by the above language from *Fuentes*, the notice given must alert the recipient to his right to a hearing, as well as to the potential deprivation. Second, the timing and type of hearing that must be provided depends on the nature of the deprivation and other contextual facts. Ordinarily, a hearing should be held before the deprivation occurs. "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." *Id.* at 81, 92 S.Ct. at 1994. Although there are exceptions to this rule when the deprivation is "random and unauthorized," *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), or when "truly unusual"

situations exist, *Fuentes*, 407 U.S. at 90–91, 92 S.Ct. at 1999–2000, there is no argument that such exceptions apply to the Fast Track demolition system. Rather, the City contends that the Ordinance provides adequate pre-deprivation remedies. The plaintiffs claim that the Fast Track scheme as set up by the Ordinance provides constitutionally inadequate notice and opportunity to be heard.

### 1. Notice

The notice prong of procedural due process requires that the government provide notice that is "reasonably calculated to inform" interested parties about the intended deprivation and the opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The notice must be "such as one desirous of actually informing the [interested parties] might reasonably adopt to accomplish it." *Id.* at 315, 70 S.Ct. at 657.

■ The Ordinance envisions three forms of notice: a sign posted on the front of the building to be demolished; letters sent to "all owners of record"; and a notice published for three consecutive days in "a newspaper published in the city of Chicago." The letters and the publication notice are to issue within 30 days after the posting of the sign. Each form of notice is to state "(i) the address of the building or description of the real estate sufficient for its identification, (ii) a statement that the property is open and vacant and a continuing hazard to the community, and (iii) a statement that the department of buildings intends to demolish, repair, or enclose the building, or remove any garbage, debris, or other hazardous, noxious, or unhealthy substances or materials if the owner or owners fail to do so." Chicago Mun.Code § 13–9–010(A)(2).[15]

---

**15.** As we noted earlier, the notice given prior to a deprivation should warn not only of the impending deprivation but also of the opportunity for a hearing. *Fuentes*, 407 U.S. at 80, 92 S.Ct. at 1994. It is possible that, under *Fuentes* and related cases, the Ordinance's silence about the fact that a property owner may file suit to prevent demolition could be seen as a failure to provide proper notice of the opportunity for a

hearing. We do not address this possibility at this time for several reasons. First, the plaintiffs have not formally raised it as part of their facial challenge. Second, to the extent that the Ordinance violates due process by not requiring this type of notice, the City has largely remedied the deficiency. Both the Fast Track letters and publication notice (although not the sign) state that a property owner may file an objection in court.

The only defect plaintiffs identify that is inherent in this statutory notification scheme (as opposed to defects in the way the scheme is carried out) is that the publication notice lists the properties subject to demolition by their addresses only, not by the owners' names. There is no constitutional requirement that publication notice contain the names of interested parties, however. The sole case the plaintiffs cite, *Schroeder v. City of New York*, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962), does not stretch far enough to support their argument. In that case, the Supreme Court held that notice by publication was constitutionally insufficient when the property owners' names and addresses were either known or easily ascertainable, so that individual notice by mail could have been provided. Of course, publication notice is to be regarded as a last resort that may not take the place of other more personalized notice where the identities of interested persons are known. Here, however, the City does not use publication notice as its only or even primary means of communicating the possibility of demolition to property owners. Instead publication notice is clearly a backup to two other means of communication that are more likely to reach the property owners. Thus, *Schroeder* is inapplicable. Nor do we think that the marginal possibility that a property owners' eyes would be caught by his name but not by the address of his property is of constitutional magnitude. We preliminarily find that, at least on its face, there is nothing constitutionally wrong with the system of notice established by the Ordinance.

### 2. Hearing

▉ No automatic pre-deprivation hearing is afforded by the Ordinance. Instead, the Ordinance places the burden on citizens who wish to contest the demolition of their property to file an "objection in an appropriate form in a court of competent jurisdiction." Chicago Mun.Code § 13–9–010(A). For purposes of this motion, the parties have assumed that this provision requires the filing of a civil lawsuit in the Circuit Court of Cook County, Illinois. Neither the Ordinance nor (as far as we are aware) any other statute or rule creates an exception to the fee normally

charged for filing such a lawsuit, which at last inquiry was $220.00.

No one disputes that the type of judicial hearing available in the Circuit Court, with all the rights normally attendant to a civil lawsuit, provides property owners with substantial protections. The plaintiffs argue, however, that requiring a property owner to bear the burden and expense of suing the City in a civil suit in order to get a hearing on whether or not his property should be destroyed is unfair and constitutionally suspect. Although there is not much case law on this topic, the cases that exist are thoughtfully reasoned and provide persuasive support for the plaintiffs' position. One of the few cases challenging an analogous scheme is *McClendon v. Rosetti*, 460 F.2d 111 (2d Cir.1971), which involved a New York City ordinance requiring ex-arrestees to sue the city in order to get back personal property from the police property clerk. The original deprivation had been constitutional, as the items were at least initially considered to be necessary to the pending criminal cases. The question was whether the ordinance's procedure for eventually getting the property back—suing the city—was constitutional.

The Second Circuit held that the ordinance was fatally deficient under the Due Process clause without completely spelling out its grounds, but condemning the requirement that citizens bring suit, especially as it resulted in shifting the normal burden of proof from the City (to show why it should be allowed to retain the property) to the citizen plaintiffs (to show why they should get their property back). *Id.*, 460 F.2d at 115. Upon remand, the district court clarified the applicable law in this area of due process. First, the court noted that "it is rarely appropriate to require an individual to bring a ... suit ... to obtain a constitutionally guaranteed hearing" to protect his property rights. *McClendon v. Rosetti*, 369 F.Supp. 1391, 1393 (S.D.N.Y.1974). The court went on to note that, in practical terms,

[p]laintiffs here and members of their class [arrestees] are generally likely to fall within the group described by the *Fuentes* [C]ourt as "uneducated, uninformed consumer[s] with little access to legal help and

little familiarity with legal procedures." 407 U.S. at 83 n. 13, 92 S.Ct. at 1995 n. 13. Nothing in the Court of Appeals' opinion leads us to believe that the [c]ourt intended to impose the burden of initiating litigation on persons with such practical disabilities; to say nothing of the added obstacle which apprehension of suing the City or police officials might constitute to people so situated.

*Id.* at 1394. The court also noted that the cost of filing suit might deter those with valid claims from pursuing a hearing.

We believe that all of these observations are correct, and applicable to this case. It is readily foreseeable that many of the owners of property that has fallen into disrepair might be poor or legally unsophisticated, and that the prospect of filing suit against the City might deter them from exercising their right to hearing that could prevent the destruction of their property.[16] For these reasons, although we do not reach a final legal conclusion on this issue, we find that the plaintiffs have demonstrated some likelihood of success on the merits of their challenge to the Ordinance on its face.

The City argues that requiring property owners to file suit in order to obtain a hearing is a common feature of statutes and ordinances whose constitutionality has been upheld. The cases cited by the City to support this argument are distinguishable on several grounds, however. For instance, the City cites to *Boudwin v. Great Bend Township,* 921 F.Supp. 1326 (M.D.Pa.1996), in which a developer raised procedural and substantive due process claims against city officials whose conduct led to the rescission of the approval of his subdivision plan. Apart from the numerous factual differences between that case and this one, the hearing provided to the developer in that case was an administrative hearing before the local sewage agency. The burdens associated with administrative hearings are in general substantially less than those associated with filing a lawsuit. Costs are typically much lower (there may be no filing fee at all), and proceedings are often designed to permit citizens to participate without a lawyer, with procedures that are relatively uncomplicated. Thus, requiring a property owner to engage in an administrative proceeding, such as the appearances before a zoning board of appeals or other municipal body as in the cases cited by the defendants, is typically far less burdensome than requiring the filing of a civil suit.

The defendants also cited *Porter v. Investors' Syndicate,* 286 U.S. 461, 470–71, 52 S.Ct. 617, 620–21, 76 L.Ed. 1226, *aff'd on reh'g,* 287 U.S. 346, 53 S.Ct. 132, 77 L.Ed. 354 (1932) for the proposition that when a statute provides that the deprivation is stayed by the commencement of an administrative review, the requirements of due process are met. We obviously have no quarrel with this proposition, which is generally applicable to the Ordinance at issue here, since it provides that demolition will be stayed during the pendency of a court challenge. But the proposition is irrelevant to the plaintiffs' point, which has to do with the heavy burden imposed by requiring property owners, rather than the City, to commence a full-blown lawsuit, rather than a relatively simple administrative proceeding, in order to get a hearing. Thus, *Porter* does not speak to the issue raised by the plaintiffs.

The defendants' last shot on this issue is more persuasive. The defendants point out that a similar Wisconsin statute, Wis. Stat. § 66.05, also creates a scheme in which an aggrieved property owner who receives a demolition order from a municipal official must "apply to the circuit court for an order" preventing the demolition. Wis. Stat. § 66.05(3). The constitutionality of this stat-

---

**16.** The burdens imposed by the Ordinance's requirement that property owners file suit if they want a hearing on the impending demolition would be greatly increased if we found (as the Second Circuit did in *McClendon*) that the requirement also shifted the burden of proof from the government to the property owner. However, we do not find any evidence that the City Council or the General Assembly intended such a shift in the burden of proof here. Although in the usual civil case the plaintiff bears the burden of proof to establish her case, here it is the City that is seeking a particular judicial resolution— an order permitting the demolition of the plaintiff's property—and thus the burden should be borne by the City. The Ordinance does not explicitly state otherwise.

ute was upheld by the Seventh Circuit in *Baker v. Mueller,* 222 F.2d 180 (7th Cir. 1955).

Although this court certainly hesitates to depart from Seventh Circuit precedent, we believe that *Baker* did not actually address the issue raised by the plaintiffs here, that is, whether requiring the property owner to file a lawsuit in order to receive a hearing is an undue burden on his Fourteenth Amendment rights. The sum total of the court's discussion of the constitutionality of § 66.05 in *Baker* was three sentences: "The statute quoted above is a clear exercise of the police power of the state. Moreover, it provides for a judicial review of the acts of the public officials involved. It does not violate the 14th amendment to the Constitution of the United States." *Id.* at 183. There is no indication that the *Baker* court confronted the issue we are presented with by the plaintiffs.[17] Nor was this burden issue raised in the various Wisconsin state court cases upholding the statute. Thus, the Seventh Circuit's pre-*Fuentes* approval of § 66.05 does not dictate our decision on the plaintiffs' burden argument. Instead, as discussed above, we find the reasoning of the Second Circuit in *McClendon* more relevant to the present issue, and accordingly are inclined to follow that reasoning. We therefore preliminarily find a "greater than negligible" chance that the plaintiffs will succeed in their claim that the Ordinance as written (including 65 ILCS 5/11–31–1(e)) violates the Fourteenth Amendment.

### B. Procedural Due Process— As Applied Challenge

■ The plaintiffs contend that, apart from any constitutional deficiencies in the Ordinance as written, there are enough violations of the Due Process Clause in the man-

ner in which the City carries out the Ordinance that it is unconstitutional as applied. Our careful review of the evidence submitted by both parties demonstrates some likelihood that the plaintiffs are right.

The files contained evidence of several serious errors in providing notice of the impending demolition to owners and other interested parties. Out of a total of 110 files, there were 12 serious errors in the City's compliance with notice requirements. These errors included failures to research the beneficiaries of a land trust and send them notice, an apparent failure to post the Fast Track sign at the property, notices that were defective in that they should have referred only to the rear building on the property, and simple failures to send letters to interested parties. The City contends that it would have caught two of these errors in the course of its regular reviews of the files, leaving ten errors that would not have been caught. Although a nine percent error rate may be adequate in many areas of endeavor, it is too high in the context of a program that may demolish up to 1,000 buildings a year. The possibility that 90 buildings in the City of Chicago are utterly obliterated every year without sufficient advance notice to their owners is simply unacceptable.[18]

The opportunity for mistakes is increased by some of the City's practices. For instance, the City passes up several sources for identifying people who may be interested in preserving, rehabilitating, or at least enclosing Fast Track properties. City inspectors do not appear to take down information about redevelopment companies whose signs may be on the building. While such information may be old, the cost of noting it and adding the name to the list of parties to be contacted would be minimal. Similarly, Fast

---

17. The defendants note that the Seventh Circuit commented on the constitutionality of § 66.05 in *Pelfresne v. Village of Williams Bay,* 917 F.2d 1017 (7th Cir.1990) (noting that § 66.05 was found constitutional by both the Seventh Circuit and Wisconsin state courts). The Seventh Circuit did not actually address the issue of § 66.05's constitutionality in *Pelfresne,* however, as it held that the plaintiff had failed to flesh out any constitutional challenge. *Id.* at 1023.

18. The parties have, to date, offered only estimates about the number of properties demolished through the Fast Track program each year. The plaintiffs quote sources indicating that the number may be 1,000; Building Commissioner Cherryl Thomas has testified that she believes it may be "a few hundred," and is probably more than two hundred. Thomas dep. at 44. Even if the total were only 200, we still find the possibility that nine percent, or 18 buildings, are demolished without proper notice to the owners to be unacceptable.

Track employees apparently do not write down information about the identity of people who telephone to communicate their intention to rehabilitate a property, or add any notes of telephone calls to the relevant files at all. This, too, is an inexpensive source of information about interested persons who should receive notice. Finally, in at least one case, a returned Fast Track letter bore forwarding information about the current owner's address that the City has never made use of. Def. Ex. 39. As the Fast Track letters are probably the City's best hope [19] of locating a property owner or other person willing to act immediately to preserve a property, there is no reason for the City not to maximize its efforts to ensure that all interested parties—whether they hold a legal property interest or not—are notified of the City's intent to demolish. We therefore preliminarily find that the plaintiffs have shown some likelihood of success on the merits of their as-applied challenge.

### C. Substantive Due Process Claim

"Unlike a procedural due process claim, in which the Court's focus is on 'how' and by what procedure the state has acted, substantive due process requires a consideration of 'what' the government has done." *Aubuchon v. Massachusetts*, 933 F.Supp. 90, 93 (D.Mass.1996). The plaintiffs claim that the City's actions in demolishing various buildings through the Fast Track program violate the substantive aspect of due process because the City had no basis for the demolitions. They point to situations in which houses have been demolished even though the house had been substantially or completely repaired at the time of the demolition as evidence that the Fast Track program routinely results in unjustified destruction of houses. *See* Def. Exs. 102, 103; Wojcik

Third Decl. ¶¶ 2, 3. The City also demolished Rev. Vinson's building without performing an additional inspection, although it had assured Rev. Vinson that it would not. Twice, City inspectors photographed two different buildings in attempting to document a single building's condition. Def. Exs. 27, 34. The City has admitted that it found "address inconsistencies" in three other files that warranted discarding those files and starting over on those properties. McDermott decl. ¶ 39(4). Moreover, McDermott testified that it was "very common" for the Fast Track program to get calls from upset owners after demolition asking "Why did you tear it down?" McDermott dep. at 3940.

The Seventh Circuit has held that "exertions of governmental power" that deprive someone of property lack a rational basis, and thus violate substantive due process, when they lack "some connection however tenuous to some at least minimally plausible conception of the public interest." *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir.1993). In this case, it is difficult to see any even "minimally plausible conception of the public interest" that is served by demolishing houses that have been substantially rehabilitated, or in otherwise mistakenly demolishing buildings. Thus, the Court concludes that, at least for now, the plaintiffs have shown some likelihood of success on their substantive due process claims.[20]

Once again, there are certainly steps that the City could take to minimize the destruction of rehabilitated houses without bringing the Fast Track program to a halt. One obvious area for improvement is in dealing with owners' efforts to rehabilitate buildings. Under the City's current practice, a property owner enters a purgatory unmarked by any clear signs of progress or failure when he

**19.** As the Eighth Circuit has noted, "[p]osting [a sign on the property] is an especially ephemeral means of giving notice, even to present possessory owners...." *Kornblum v. St. Louis County*, 72 F.3d 661, 664 (8th Cir.1995). In the present case, a City inspector testified that only about half the time are the signs still on the buildings at the third inspection (about thirty to forty days after they are posted).

**20.** In reaching this conclusion, we do not ignore the other teachings of *Gamble*, one of which is

that substantive due process claims ordinarily cannot be brought until the plaintiffs have exhausted any state remedies that they may have, for example, inverse condemnation proceedings. 5 F.3d at 287–88. Because the parties have presented us with relatively limited evidence at this stage, however, we have no basis for finding that the plaintiffs have not met this requirement. Accordingly, any rejection of the plaintiffs' substantive due process claims on non-exhaustion grounds must await further factual development.

embarks on attempts to repair (or even enclose) his property. Although he may communicate his plans to the Fast Track office, no notice is taken of such communications. Fast Track employees provide him with no assistance in identifying necessary repairs, or in receiving feedback about whether his efforts are sufficient to forestall demolition. Even if his efforts are successful, he is not given any information about the City's ultimate disposition regarding his property. And if he rehabilitates but does so too late (after the final Fast Track inspection), the evidence shows that the demolition contractor is likely to destroy the rehabilitated house. This court can easily imagine ways in which these confusion- and error-producing procedures could be remedied without unduly delaying demolition, if that is what is ultimately required. We are astonished that the City's imagination has not produced a better system in this area than the present informal system which lacks any objective administrative standards.

Although the plaintiffs have brought other claims in their Amended Complaint, the request for a preliminary injunction does not appear to be based on those claims, and thus we do not consider the likelihood of their ultimate success. As to the plaintiffs' constitutional claims, we find that the plaintiffs have shown the necessary likelihood of success on the merits, and proceed to consider the other requirements for injunctive relief.

## II. INADEQUATE LEGAL REMEDY/IRREPARABLE HARM

■ It is hornbook law that real property is unique, and thus the usual legal remedies (monetary damages) are insufficient to compensate plaintiffs for its loss. *United Church of the Medical Ctr. v. Medical Ctr. Comm'n,* 689 F.2d 693, 701 (7th Cir.1982) (the uniqueness of land is "settled beyond the need for citation"). The plaintiffs here have either suffered or are in danger of suffering the destruction of the buildings on their property, and the consequent loss of much of that property's value, not to mention the

emotional repercussions of losing what at one time may have been the family home.[21] In these circumstances, we find that the plaintiffs have demonstrated the inadequacy of legal remedies and either actual or potential irreparable harm.

■ The City argues that an injunction is not necessary to safeguard the plaintiffs' real property interests, because the Ordinance provides safeguards of its own—i.e., the ability to file suit to prevent the demolition, or the options of boarding up or repairing the house. We have already held that placing the onus on a property owner to file a civil suit may be constitutionally suspect, and the evidence produced so far indicates that boarding up or repairing a house may not, in fact, be effective in preventing demolition. Thus, we reject the City's argument that the Ordinance itself is sufficient to prevent irreparable harm. If that were true, the plaintiffs would not have filed this suit.

## III. BALANCE OF HARMS

■ Once plaintiffs have shown some likelihood of succeeding on the merits of their claims, an inadequate remedy at law, and irreparable harm, a court must go on to consider the balance of harms and the public interest. In weighing the balance of harms, a court is to consider "the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied." *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100 F.3d 1287, 1291 (7th Cir. 1996). As noted above, the irreparable harm to the plaintiffs if the preliminary injunction is not granted is severe: several houses remain in the Fast Track and subject to demolition despite the presence of mistakes, including defective notice to interested parties and other important oversights, and the consequences of such mistakes are drastic—the loss of a building. By contrast, the irreparable harm to the City if the injunction is granted is minimal. Although the City would no longer be able to demolish abandoned buildings through the Fast Track pro-

---

**21.** Our review of the title searches in the City's files indicates that, in many cases, the last known taxpayer appears to be a child or other relative of an owner. Plaintiff McKenzie is one example of this fact pattern.

gram, it would still be able to seek demolition orders through the Demolition Court. Nowhere in its submissions to this court has the City articulated any reasons why Demolition Court proceedings are not a viable process for accomplishing the goals of the Fast Track program. While this court does not minimize the dangers posed by abandoned and dilapidated buildings, the court is simply not persuaded that the Fast Track program, with the errors that appear in the record before us, is the only way to combat those dangers.

## IV. THE PUBLIC INTEREST

■ There can be no doubt that the public has an interest in seeing vacant and deteriorated houses repaired, boarded up, or torn down so that they cannot become a breeding ground for crime or vermin. Nevertheless, the public also has an interest in the preservation of valuable housing stock. If the buildings torn down through the Fast Track program were always ramshackle wrecks or burnt-out hulks, this interest would be less important. Fast Track officials have stated, however, that their primary concern is not the condition of the buildings but whether the buildings are "open," i.e., the interior is accessible. Buildings that appear to be good candidates for rehabilitation are therefore demolished through Fast Track. And the evidence suggests that buildings that have been substantially or completely rehabilitated have been demolished as well, albeit mistakenly. Def. Exs. 102, 103. The public also has an overall interest in seeing that houses are not mistakenly demolished, or demolished without notice, in part because governmental misfeasance potentially injures everyone and in part because such actions may make the City liable for damage suits. For all of these reasons, we find that the public

interest does not weigh against the injunction.

As all of the requirements have been met, we grant the plaintiffs' motion for a preliminary injunction.

## SCOPE OF THE INJUNCTION

The defendants shall refrain from ordering, authorizing, putting out for bid, or otherwise pursuing any demolition through the Fast Track program, or in any other manner implementing Chicago Municipal Code § 13–9–010 or 65 ILCS 5/11–31–1(e), until further order of this Court. Any Fast Track demolitions that have already been authorized, bid upon, or that are otherwise currently in the hands of contractors must immediately be halted, and the authorizations or contracts suspended.[22]

This court is aware that the defendants' motion to dismiss, as well as the plaintiffs' motion for class certification, are presently being briefed. To the extent that the eventual outcome of those motions requires it, this court will revisit the scope of this injunction in the future.

---

**22.** The defendants have argued that, as no class has yet been certified in this putative class lawsuit, this court lacks jurisdiction to enjoin them from demolishing any property other than that belonging to the named plaintiffs and intervenors. This argument has two flaws. First, the issue of the constitutionality of Chicago Municipal Code § 13–9–010 and 65 ILCS 5/11–31–1(e) as written is properly before us, and our preliminary finding that those enactments are unconstitutional permits us to enjoin the defendants from carrying out any demolitions based upon those enactments. *See Ex parte Young,* 209 U.S. 123, 159, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908) (enforcement of an unconstitutional enactment is illegal). Second, even if we had not found the enactments to be constitutionally invalid as written, the multiple errors shown by the preliminary evidence would support the prohibitory injunction of the entire Fast Track program simply so that additional unconstitutional deprivations do not take place before the ultimate resolution of this case.